**Lucien LOISEAU, Plaintiff,**

v.

**The DEPARTMENT OF HUMAN RESOURCES OF the STATE OF OREGON, et al., Defendants.**

Civ. No. 81–1020–PA.

United States District Court, D. Oregon.

July 8, 1983.

Richard C. Busse, Portland, Or., for plaintiff.

Dave Frohnmayer, Atty. Gen., Josephine Hawthorne, Asst. Atty. Gen., Salem, Or., for defendants.

## OPINION AND ORDER

PANNER, District Judge.

Plaintiff, a black male, is a naturalized citizen from French Martinique in the West Indies. Since January, 1974, he has been employed by the Adult and Family Services Division ("AFS")[1] of the Oregon Department of Human Resources ("Department"). Defendants are the Department and three named individuals. In 1976 and 1978, plaintiff unsuccessfully sought promotion from Welfare Assistance Worker II to Welfare Assistance Supervisor. He alleges he has been deprived of his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* I previously granted summary judgment for the three named defendants as to plaintiff's claims founded on 42 U.S.C. §§ 1981, 1983, 1985, and 1986, and the Thirteenth and Fourteenth Amendment. *Loiseau v. Dept. of Human Resources,* 558 F.Supp. 521 (D.Or.1983). I have also dismissed all claims against the Department except those based on Title VII. Opinion and Order of December 22, 1982. After trial, I now hold for the plaintiff.

## BACKGROUND

In this proceeding, plaintiff challenges the Department's use of a promotional selection device known as the Promotional Merit Rating ("PMR") and the failure to promote him on two occasions.

Plaintiff was first hired by the Department as a Welfare Assistance Worker I on January 7, 1974. Pretrial Order, Agreed Fact No. 3. He was promoted to Welfare Assistance Worker II on February 1, 1975. Defendant Dwight Long was branch manager at the North Portland AFS branch until October, 1976. *Id.* No. 5. Long resigned from the Department in March, 1977. *Id.* No. 6. In October, 1976, defendant Bettie Larson became manager of the North Portland branch. *Id.* No. 5. She resigned from the Department in October, 1981. *Id.* No. 7. In December, 1976, defendant Michael Buckley was promoted to the position of Welfare Assistance Supervisor at the North Portland branch. *Id.* No. 9. In this capacity, he supervised plaintiff in a unit handling an Aid to Dependent Children caseload. *Id.* Buckley is currently employed by the Department. *Id.* No. 8. In 1978, plaintiff transferred from the North Portland AFS branch to the South Portland branch. *Id.* No. 18. He only challenges actions which took place at the North Portland branch.

Plaintiff applied for promotion to the position of Welfare Assistance Supervisor on January 30, 1976 and again on January 25, 1978. *Id.* Nos. 11, 12. In 1976, he was not selected for promotion, Pretrial Order, Agreed Fact No. 13, because his PMR score did not qualify him for listing on the certification of eligible candidates. In 1978, his Promotional Merit Rating form was not forwarded by his supervisor to the Personnel Office and he was not further considered for promotion. Plaintiff remains a Welfare Assistance Worker II.

As a black person from French Martinique, plaintiff is a member of two classes protected by Title VII. *See generally Garcia v. Tri-County Metropolitan Transportation District,* Civ. No. 81–981–JU, op. at 6 (D.Or. Jan. 5, 1983) (citing cases in which "allegations contained elements of both racial and national origin discrimination").

The Department is an employer within the meaning of Title VII. Pretrial Order,

---

1. The Adult and Family Services Division, in existence under previous names for over a half-century, provides financial and other assistance to low income families and individuals. Assistance and services are provided through more than fifty branch offices throughout the state, grouped into five administrative regions. Joint Exhibit No. 1.

Agreed Fact No. 2. An action against the Department is not barred by the Eleventh Amendment.

## DISPARATE IMPACT

Plaintiff is challenging both the Department's promotional selection system in general, particularly the use of the PMR, and its specific application to him. His allegations thus constitute both a disparate impact and a disparate treatment case under Title VII. *Wang v. Hoffman,* 694 F.2d 1146, 1147 (9th Cir.1982). His allegations also constitute a Title VII retaliation case. I am required to consider the disparate impact claim first. *Id.* at 1149; *Peters v. Lieuallen,* 693 F.2d 966, 970 n. 2 (9th Cir. 1982).

### I. *Legal Standards.*

■ A disparate impact claim challenges a practice neutral on its face, but having a more adverse impact on minorities than on others. *Wang,* 694 F.2d at 1147, *citing Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726–27, 53 L.Ed.2d 786 (1977); *Blake v. City of Los Angeles,* 595 F.2d 1367, 1375 (9th Cir.1979), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). The plaintiff has the initial burden of proving that the selection process results in a "significantly discriminatory pattern" of promotions. *Wang, supra, citing Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 2531–32, 73 L.Ed.2d 130 (1982); *Contreras v. City of Los Angeles,* 656 F.2d 1267, 1271 (9th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982).

To establish his prima facie case, Loiseau "need only demonstrate the lack of objective criteria and a disparity in job promotions." *Wang,* 694 F.2d at 1148. *See also Wambheim v. J.C. Penney Co.,* 642 F.2d 362, 365 (9th Cir.1981), *appeal after remand,* 705 F.2d 1492 (1983) ("[T]he plaintiff must demonstrate a facially discriminatory policy or a facially neutral policy which has a substantially disproportionate impact.... This showing constitutes the prima facie case."); Baldus & Cole, Statistical Proof of Discrimination § 1.23 at 17 (Cum.Supp.1982) ("The disparate impact theory has also been used to attack highly discretionary selection procedures.").

Once plaintiff has met his initial burden, [T]he burden of proof shifts to the employer to prove either that the plaintiff's statistics are inaccurate and no disparity exists, *Dothard,* 433 U.S. at 338–39, 97 S.Ct. at 2731–32 (Rehnquist, J., concurring); *Contreras,* 656 F.2d at 1272–74, or that the practice is necessary to the efficient operation of the business, *Connecticut v. Teal,* 457 U.S. at 446–49, 102 S.Ct. at 2531–32, *Dothard,* 433 U.S. at 331 n. 14, 97 S.Ct. at 2728 n. 14; *see Contreras,* 656 F.2d at 1271.

*Wang, supra. See also Griggs v. Duke Power Company,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971) (After a prima facie case is established, the employer has "the burden of showing that any given requirement [has] a manifest relationship to the employment in question."); *Wambheim v. J.C. Penney Co.,* 705 F.2d 1492, 1494–95 (9th Cir.1983).

■ If the employer uses a test for job promotion, and plaintiff establishes that such test has a disproportionate impact on a class protected by Title VII, the burden of proof then shifts to the employer to prove that the screening device is job related. "Failure in this proof results in judgment for the plaintiff." *Contreras,* 656 F.2d at 1271.

■ The defendants have conceded that no validation studies have been made of the selection device challenged here. Pretrial Order, Agreed Fact No. 22. Such studies are required to validate a test as job related. *Contreras,* 656 F.2d at 1280. Thus, plaintiff will prove his disparate impact case if he demonstrates that the PMR lacks objective criteria and results in a disparity

in job promotions for minorities.[2] *Wang,* 694 F.2d at 1148.

## II. *Discussion.*

### A. *Promotional Merit Rating.*

An applicant for promotion to the position of Welfare Assistance Supervisor submits an application to the Personnel Division of the State of Oregon's Executive Department for approval of his minimum qualifications. After such approval, the applicant's immediate supervisor at AFS prepares a Promotional Merit Rating. The PMR at issue in this action contained the following items:

Extensive and detailed knowledge of agency policies and procedures and experience in the delivery of public assistance and food stamps.

Demonstrated ability to direct, control, manage and coordinate the operations of a supervisory unit in the provision of public assistance and food stamps.

Capability to manage the personnel of a unit ranging from 5 to 15 employees to maintain good morale and achieve the performance expectations of the unit.

Capacity to comprehend and assimilate agency objectives and directives and to convey effectively to others clearly and concisely.

Demonstrated ability to adapt and accept changing conditions and priorities, and to support policies and procedures originating external to the organizational unit.

Demonstrated ability to operate effectively under pressure and respond appropriately to both superior and subordinate levels.

Willingness to accept responsibility and confidence in making decisions based on successful past performance.

Demonstrated interest in solving problems and responsiveness to challenges.

Demonstrated emotional stability, self-confidence and enthusiam.

Demonstrated ability to lead and win acceptance as evidenced in relationships with other people.

Joint Exhibit Nos. 25, 26, 28.

After completion by the applicant's supervisor, the PMR is filled out by another person familiar with the duties of the position sought. In the case of plaintiff, this second person was the North Portland branch manager. The Personnel Division scores the rating and places the applicant's name on a certificate of eligibles from which selection for promotion is made.

The PMR form consists simply of two sheets of paper containing the ten items listed down the left hand side of the paper, and four columns with ratings: "Major development needed," "Employee development required to fully meet standards for promotion," "Meets standards for promotion," and "Exceeds standards for promotion." *Id.*

As discussed *infra* under "disparate treatment," three PMR's were filled out on plaintiff. Because only one PMR form is completed on each occasion, the second rater can see what the first rater marked. In plaintiff's case, all three of the PMR's contained identical ratings from his supervisor and branch manager.

In this circumstance, it cannot be said that the PMR is an objective measure of an applicant's ability. It is extremely unlikely that an applicant will receive an objective rating when the second rater knows the first rater's evaluation. The qualifications measured may well be important to successful performance of the Wel-

**2.** In a discriminatory impact case, plaintiff need not prove discriminatory intent on the part of the employer. *Griggs,* 401 U.S. at 432, 91 S.Ct. at 854; *Wambheim v. J.C. Penney Co.,* 705 F.2d at 1494; *Wang, supra.* Nor must plaintiff prove that he would have been the most qualified person for the job. *Wang, supra.* The criteria established for disparate *treatment* cases by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), are not applied in disparate *impact* analysis. *Wang, supra.*

fare Assistance Supervisor's responsibilities, but this form does not measure them objectively.

In *Nanty v. Barrows Co.,* 660 F.2d 1327 (9th Cir.1981), the court stated that:

Subjective job criteria present potential for serious abuse and should be viewed with much skepticism. Use of subjective criteria not only has, in many instances, a disparate impact on minorities, but also provides a convenient pretext for discriminatory practices. Subjective criteria may easily be asserted as the reason for an adverse employment decision when, in fact, the reason was discrimination.

*Id.* at 1334.

I conclude plaintiff has demonstrated that the promotional selection device at issue here lacks objective criteria, particularly where the second rater knows the first rater's evaluation. *See Wang,* 694 F.2d at 1148.

### B. *Statistical Evidence of Disparity in Promotions.*

 Since 1976, there has not been one appointment of a black Welfare Assistance Supervisor in AFS, during which time fifty-three opportunities were presented. *See* Plaintiff's Exhibit No. 5. Whether this evidence is sufficient to provide the final element of a prima facie case of disparate impact depends on an analysis of the statistics. *See* Baldus & Cole, Statistical Proof of Discrimination § 1.231 at 47–48 (1980).

Plaintiff's expert, James Norborg, testified both as to the overall black/non-black composition of the AFS Welfare Assistance Supervisor positions and to the actual selections of blacks and non-blacks for Supervisors.

The first set of statistics pertain to the "eighty percent" or "four-fifths" rule. Norborg testified that there were a total of 581 Welfare Assistance Worker IIs and IIIs, twenty-four of whom were black, no black Welfare Assistance Supervisors, and sixty-nine non-black Welfare Assistance Supervisors. The probability of selecting sixty-nine non-black Supervisors and no black Supervisors from a pool which is four percent black is 0.07, an improbable event that would occur only one time in fourteen given a neutral selection system. The selection rate for non-blacks is sixty-nine divided by 559 or 12.3 percent, and the selection rate for blacks is zero. The Equal Employment Opportunities Commission has adopted as guide for evidence of adverse impact a rule that is violated when the selection rate of non-blacks (here, 100 percent) exceeds the selection rate for blacks (here, zero percent) by more than eighty percent.

The second set of statistics is an analysis of the available applicant data to determine whether there was statistical significance to the selection rates of blacks versus non-blacks since 1976. Norborg testified that applicant data is the most probative data from which to draw conclusions concerning the presence or absence of discrimination in an employer's selection procedures.

The Department provided complete applicant data for three years. For the year ending June 30, 1979, four blacks applied and there were 102 applicants. For the year ending June 30, 1980, five blacks applied and there were seventy applicants. For the year ending June 30, 1981, three blacks applied and there were forty-eight applicants.

Norborg took the total number of blacks and total applicants during the three-year period, applied a mean average to these figures to derive the number of blacks and total applicants for each of those earlier periods, except that the initial period was calculated as a six-month period to coincide with the January, 1976 filing of plaintiff's first application for promotion.

Norborg then took the number of hires during each time interval, as previously provided to plaintiff, and calculated the probability of not hiring a black in each of the intervals examined.

Finally, Norborg calculated the probability of not hiring a black during the entire

period under study. He found that the probability of selecting zero blacks from that pool of black applicants was 0.03. This is an improbable event which would occur less frequently than one in thirty times given a neutral selection system. The figure has significance beyond the 0.05 level generally accepted as determining statistical significance. *See* Plaintiff's Exhibit No. 7.

The Department is subject to the Uniform Guidelines on Employee Selection Procedures. 29 C.F.R. Part 1607. The Guidelines require that records concerning the impact which an employer's tests and other selection procedures have on employment opportunities be maintained. 29 C.F.R. § 1607.4A. The Guidelines state that where an employer has not maintained data on adverse impact, federal enforcement agencies may draw an inference of adverse impact from the failure to maintain such data, if the employer has an under-selection of group in the job category. 29 C.F.R. § 1607.4D.

The Department had the responsibility to keep accurate statistical records for the three-year period of 1976 to 1979, and make these records available to plaintiff. The Department did not do so. The plaintiff's expert examined the available statistics and extrapolated from them to make estimates where actual statistics were not available. I find Norborg's extrapolation reasonable.

I also find Norborg's methods a reasonable interpretation of black and non-black hires for the period in question. Considering the number of times each black person applied for promotion is more logical and gives a more accurate picture than defendants' expert's method of counting only the number of people belonging to a protected class that applied for positions.

I conclude that the evidence of discrimination against blacks found in defendants' selection practices is statistically significant and meets plaintiff's burden to show a disparity in job promotions. *Wang,* 694 F.2d at 1148.

III. *Summary.*

As noted earlier, in this case a decision that plaintiff has met his prima facie case will be a decision on the merits. Plaintiff has proven his disparate impact case.

## DISPARATE TREATMENT

I. *Legal Standards.*

■ A plaintiff who is a member of a class protected by Title VII establishes a prima facie case of disparate treatment by proving facts supporting an inference that he was denied promotion because the employer intentionally discriminated against him. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Jones v. Los Angeles Comm. College Dist.,* 702 F.2d 203, 205 (9th Cir.1983); *O'Brien v. Sky Chefs, Inc.,* 670 F.2d 864, 866 (9th Cir.1982).

■ The plaintiff need not prove intentional discrimination at this first stage. *E.g., Officers for Justice v. Civil Service Comm'n of San Francisco,* 688 F.2d 615, 627 n. 14 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983). Rather, it is sufficient if plaintiff proves facts "showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on discriminatory criterion illegal under the [1964 Civil Rights] Act.'" *Furnco Construction Co. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), *quoting Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). *See Peters,* 693 F.2d at 969. "A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco,* 438 U.S. at 477, 98 S.Ct. at 2949–50.

■ To rebut the prima facie case, defendants must articulate some legitimate, nondiscriminatory reason that justifies the denial of promotion. *Cf. McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. "[T]he employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine,* 450 U.S. at 257, 101 S.Ct. at 1096.

■ If the defendants successfully rebut the prima facie case, plaintiff must then prove by a preponderance of the evidence that the defendants' reasons are pretextual. *Id.,* 450 U.S. at 254, 101 S.Ct. at 1095; *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. "At this stage, the *McDonnell-Burdine* presumption 'drops from the case,' . . . [and] [t]he District Court [is] then in a position to decide the ultimate factual issue in the case." *U.S. Postal Service v. Aikens,* —— U.S. ——, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

II. *Discussion.*

■ The position of Welfare Assistance Supervisor is an AFS agency promotional position. There is no hiring outside the division. The minimum qualification is current employment in AFS and two years' service as a Welfare Assistance Worker. Pretrial Order, Agreed Fact No. 10; Joint Exhibits Nos. 9, 10.

At the time of his January, 1976 application for Welfare Assistance Supervisor, plaintiff was a Welfare Assistance Worker II at the North Portland AFS branch. As he was hired by AFS in January, 1974, he had the two years experience minimally required for the Supervisor position. Pretrial Order, Agreed Fact No. 11; Joint Exhibit No. 11.

At the time of his January, 1978 application, plaintiff was still a Welfare Assistance Worker II at the North Portland branch. At this time he had four years experience and thus met the minimum requirements for promotion. Joint Exhibit No. 12.

Supervisors rating plaintiff in 1976 regarded him as meeting the standards for promotion in eight out of ten areas. *Id.* No. 26. More significantly, his 1976–77 Report of Performance Appraisal was very favorable. *Id.* No. 15. Plaintiff's education considerably exceeded that of many Welfare Assistance Supervisors. Plaintiff was and is well qualified for promotion.

Plaintiff has established a prima facie case of disparate treatment.

Defendants articulated a legitimate, nondiscriminatory reason for the denial of promotion. That justification was that plaintiff lacked the ability to communicate well with people, to maintain organized files, to establish priorities for his time, and to lead or to develop leadership skills.

However, defendants' reasons for denying plaintiff promotion are not persuasive, and are pretexts for intentional discrimination. The reasons are contradicted by plaintiff's education, his length of time on the job as a Welfare Assistance Worker, the 1976–77 Report of Performance Appraisal, *id.,* as well as the unfortunate manner in which plaintiff's 1976 and 1978 applications were handled.

In 1976, plaintiff was given an oral test by Dwight Long. At the time of the interview, Long and other supervisors at the North Portland branch had not administered oral interviews to other applicants for promotion. Loiseau was the first. An oral test was not given to three other applicants for the Supervisor position at the North Portland branch in 1976. Plaintiff's Exhibit No. 9; Pretrial Order, Agreed Fact No. 12. *Cf. Harless v. Duck,* 619 F.2d 611, 616–17 (6th Cir.), *cert. denied,* 449 U.S. 872, 101 S.Ct. 212, 66 L.Ed.2d 92 (1980) (criticizing oral test).

After the oral interview, plaintiff received a Promotional Merit Rating. Joint Exhibit No. 25. *See generally* 558 F.Supp. at 522–23. He protested his low score, and then received another PMR, reflecting a higher rating. Joint Exhibit No. 26. Dur-

ing the interview, plaintiff was asked to read passages from a Departmental manual.

In 1976, Karen Goetz, plaintiff's immediate supervisor, filled out both PMR's before the branch manager, Long, did so. All ratings were identical. *Id.* Nos. 25, 26. In 1978, Michael Buckley, plaintiff's immediate supervisor, filled out the PMR before the branch manager, Bettie Larson, did so. All ratings were identical. *Id.* No. 28. It is inconceivable that plaintiff received objective ratings when all three PMR's showed identical ratings from both his supervisor and the branch manager. By contrast, *see* Defendants' Exhibits Nos. 101–03.

The second 1976 PMR, Joint Exhibit No. 26, shows that plaintiff met the requirements for promotion in all but two areas:

Demonstrated ability to direct, control, manage and coordinate the operations of a supervisory unit in the provision of public assistance and food stamps.

Capability to manage the personnel of a unit ranging from 5 to 15 employees, to maintain good morale and achieve the performance expectations of the unit.

*Id.* The record offers no basis for the low ratings in these two areas. Plaintiff would likely not have "demonstrated ability" to supervise where he had been given no supervisory responsibilities. He was denied promotion for lack of leadership skills, but the record does not demonstrate that plaintiff lacked such skills. He received a score of 83 on the second PMR, *see id.* No. 27. I find that Goetz and Long knew that the rating they were making would disqualify plaintiff from promotion.

In 1978, plaintiff's supervisor prepared a PMR dated March 7, 1978, but did not forward the PMR to the AFS Personnel Office. Accordingly, plaintiff's name was not placed on the promotional list for the Welfare Assistance Supervisor position and he was not considered.

In April, 1978, plaintiff inquired of the AFS personnel office as to the whereabouts of his PMR. He was told that the branch office had failed to forward the PMR. Between April and October, 1978, he spoke with his immediate supervisor about his application. In April, 1979, he complained to the Bureau of Labor. In 1979, he learned that his 1978 score was low. On April 7, 1980, his Branch Manager notified plaintiff in writing as to what had happened to his 1978 application, giving essentially the same explanation as he had received in April, 1978.

On November 25, 1980, plaintiff received a letter from the Director of the Department forwarding a copy of the March 7, 1978 PMR . . . .

558 F.Supp. at 523.

Plaintiff's 1978 application was not fairly considered. His PMR may have been hidden for over two years.

Plaintiff's expert Dr. Michel Laguerre testified to the difficulty of assimilation of West Indian blacks into American culture, both white and black. *See generally* Plaintiff's Exhibit No. 8 (Dr. Laguerre's resume). Claire Jeannis, a Haitian native, also testified to the difficulties encountered by West Indian blacks in this country. I accept the testimony of both witnesses as accurate. From the reaction I sensed in the courtroom to Dr. Laguerre's testimony, I also accept as accurate his assessment of the negative reactions, even hostility, encountered by West Indian blacks to their speech, which may be hard to understand and may form the basis for personality conflicts.

The evidence in this case established that even at the outset of his employment, plaintiff was not treated well by his supervisors, on account of his national origin. He has a heavy French accent, and appears steeped in the cultural background of West Indian French speaking persons. There was testimony that the ways of such people strike native-born Americans as peculiar; plaintiff's ways struck many of his co-workers and superiors as peculiar. The style of writing and of speaking of such people is different. Persons who are not sensitive to

those differences may tend to become impatient with the French speaking West Indian black. The evidence is clear that it was so here. Plaintiff's supervisors interpreted as questions his statements which sought affirmation on a given point. They discouraged his asking questions. One "lead worker" even went so far as to try behavior modification techniques to attempt to change plaintiff's style. The reaction to plaintiff of many of these persons was that he was "stupid" or "ignorant." With assistance from more enlightened persons, plaintiff's work product improved. Nevertheless, there is evidence that plaintiff was relieved of certain duties at one point without cause or prior notification; that he was assigned an "adult" caseload without training; and that he was given an adverse work performance appraisal when there was no mutually developed work plan against which to measure his performance, contrary to the union contract. I found that plaintiff tried to be very accurate in his own testimony, and that he was a credible witness.

In light of all the evidence, I conclude defendants intentionally discriminated against plaintiff in denying him promotion in 1976 and 1978. Plaintiff has proven his disparate treatment case.

## RETALIATION

### I. *Legal Standards.*

It is a violation of Title VII for an employer to discriminate against any employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3.[3] The burdens of production and persuasion to establish a violation of this section are the same as those set forth in *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25. *Kauffman v. Sidereal Corp.,* 695

F.2d 343, 344 (9th Cir.1982); *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir.1982).

Thus, to establish a prima facie case, plaintiff need only show he was denied promotion following conduct on his part that constituted protected activity and that the employer was aware of the conduct. *See Gifford v. Atchison, Topeka and Santa Fe Ry. Co.,* 685 F.2d 1149, 1155 (9th Cir. 1982) (citations omitted). If plaintiff establishes a prima facie case, the burden of production then shifts to the employer to show legitimate nondiscriminatory reasons for the denial of promotion. If the employer makes such a showing, the employee then must be afforded a fair opportunity to show that the asserted reasons are in fact pretext. *See Aguirre v. Chula Vista Sanitary Service,* 542 F.2d 779, 781 (9th Cir. 1976). The ultimate burden of persuading him remains at all times with the plaintiff. *Cohen,* 686 F.2d at 796–97.

In this circuit, the "but for" test is used to evaluate plaintiff's evidence of causation.

> Under this test, it must be established by a preponderance of the evidence that engaging in the protected activity was one of the reasons for the [denial of promotion] and that but for such activity the plaintiff would ... have been [promoted].

*Kauffman,* 695 F.2d at 345.

### II. *Discussion.*

On or about May 18, 1976, plaintiff filed a complaint with the Bureau of Labor and the Equal Employment Opportunities Commission, within the time prescribed by law for filing such complaints, alleging discrimination based on race, color, and/or national origin. Pretrial Order, Agreed Fact No. 14. In 1979, plaintiff timely filed a second complaint alleging employment discrimination. *Id.* Nos. 19, 20. The 1979 complaint also charged defendants with retaliation for

---

**3.** The statute "shields an employee from retaliation regardless of the merit of his EEOC charge." *Sias v. City Demonstration Agency,* 588 F.2d 692, 695 (9th Cir.1978) (citation omitted).

plaintiff's having filed the 1976 complaint. *Id.* No. 19.

Larson equivocated when asked whether she was aware of plaintiff's complaint. I find that supervisory personnel at the North Portland branch, including Larson and Buckley, were aware of plaintiff's civil rights complaint. I previously granted summary judgment for defendant Long on the retaliation claim because he had transferred from the North Portland branch in November, 1976, and plaintiff conceded that Long did not retaliate. 558 F.Supp. at 527. While Larson did not come to the North Portland branch until after plaintiff had filed his 1976 complaint, I find that Larson was aware of the complaint.

A careful review of plaintiff's Promotional Merit Rating for 1978, Joint Exhibit No. 28, and his Reports of Performance Appraisal, *id.* Nos. 13–20, indicate no personality problems on the part of the plaintiff until after his civil rights complaint was filed. I find no basis other than retaliation for the extremely low marks which Buckley and Larson gave plaintiff in the 1978 PMR, *id.* No. 28, especially when that PMR is compared with the second 1976 PMR, *id.* No. 26.

The testimony given by defendants' witnesses about plaintiff's behavior at work—that he was disruptive, had difficulty in grasping concepts, etc.—was more the product of hindsight than an accurate portrayal of what occurred after plaintiff filed his civil rights complaint.

Defendants' actions clearly buttress the conclusion of intentional discrimination I have already found.

██ An employer will not be liable for retaliation if the employer would not have promoted a civil rights complainant for objective reasons such as a lack of qualifications entirely untainted with discriminatory animus. But the employer may be liable if he had both retaliatory and discriminatory motives. The "but for" test, *Kauffman,* 695 F.2d at 345, was not meant to immunize defendants from liability for retaliation when they have denied promotion for discriminatory as well as retaliatory reasons, if the latter motivation is significant. The "but for" test certainly does not apply if defendants had no objective, nonpretextual reason for denying plaintiff promotion after he filed his civil rights complaint.

██ I concluded in the previous section that defendants' reasons offered to rebut plaintiff's prima facie case of disparate treatment were a pretext for discrimination. I conclude here that those same reasons offered to rebut plaintiff's prima facie case of retaliation are a pretext for retaliation. Plaintiff has established by a preponderance of the evidence that the Department and defendants Buckley and Larson retaliated against him for his 1976 complaint.

## CONCLUSION

It is incumbent on those in positions of social power, including supervisory personnel in state government agencies, to act fairly and without discrimination towards employees of a different race, color or national origin (including cultural heritage and language pattern) than their own. Our Constitution and civil rights laws so require.

I conclude the Department and the three named defendants discriminated against Lucien Loiseau in violation of Title VII of the Civil Rights Act of 1964.

The foregoing constitute findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

Plaintiff has ten (10) days from the filing of this opinion to file a supplemental brief on appropriate relief, with supporting authorities. Defendants have ten (10) days to respond, and plaintiff may have five days to reply. A hearing on relief will be scheduled for Monday, August 1, 1983 at 1:30 p.m.

IT IS SO ORDERED.