**June GRAHAM, Plaintiff,**

v.

**The BENDIX CORPORATION, Defendant.**

**No. S82–19.**

United States District Court,
N.D. Indiana,
South Bend Division.

April 20, 1984.

**1038**

Prof. Frank Booker, Notre Dame, Ind., for plaintiff.

Robert Kenagy, South Bend, Ind., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

This case was tried before the court on February 6, 1984 in South Bend, Indiana. This will state the legal basis of the separately entered findings and conclusions.

This is a claim under Title VII of the Civil Rights Act of 1964 for employment discrimination on the basis of race and sex. The plaintiff is a black female person. This is a "disparate treatment" case.

The starting point is *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668 (1973), where the Supreme Court dealt with shifting burdens of going forward with the evidence. The court stated one permissible form of *prima facie* case, suitable for a non-hiring complaint under Title VII, while cautioning that this pattern would not be applicable to all Title VII cases. *Id.* The question of burdens of proof and the shifting burdens of going forward with the evidence were further addressed by the Supreme Court in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The Supreme Court had warned over the intervening years that the *McDonnell Douglas prima facie* case "was not intended to be an inflexible rule", but that "the facts necessarily will vary in Title VII cases, and the specification of the *prima facie* proof required from Respondent is not necessarily applicable in every respect to differing factual situations." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 575–6, 98 S.Ct. 2943, 2948–9, 57 L.Ed.2d 957 (1978). There the Court held that:

> The central focus of the inquiry in a case such as this is always whether the employer is treating "some people less favorably than others because of their race, color, religion, sex, or national origin" *Teamsters v. United States, supra* [431 U.S.], at 335 n. 15 [97 S.Ct. at 1854 n. 15]. The method suggested in *McDonnell-Douglas* for pursuing this inquiry, however, was never intended to be rigid, mechanized, or ritualistic.

438 U.S. at 577, 98 S.Ct. at 2949.

■ The Supreme Court's latest and clearest word on this subject is *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), in which the Court held that where the district court has heard and received all of the evidence in the case, the question of *prima facie* case at some earlier stage of the proceedings "is no longer relevant." 460 U.S. ——, 103 S.Ct. at 1482. The Supreme Court cautioned that attempting to focus backward on the *prima facie* case after the evidence was all in would be to evade unnecessarily the ultimate question of discrimination *vel non*. 460 U.S. at ——, 103 S.Ct. at 1481. The factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff. The district court must decide which party's explanation of the employers motivation it believes. 460 U.S. at ——, 103 S.Ct. at 1482. *Aikens* is controlling. It is the clear teaching of *Aikens* that a district court cannot require a plaintiff to submit direct evidence of discriminatory intent. 460 U.S. ——, n. 3, 103 S.Ct. at 1481, n. 3. The *Aikens* approach places in proper perspective defendant arguments that no plaintiff shows forbidden discrimination unless they duplicate the *prima facie* case of *McDonnell*, which was a hiring case, when many cases have an altogether different set of circumstances. The *McDonnell* suggestion does not re-

quire litigants and courts to attempt to pound "square pegs in round holes". *Burdette v. FMC*, 566 F.Supp. 808, 815–817 (S.D.W.Va.1983).

As *Aikens, supra*, directs, this court should reach the central focus of the case and decide the discrimination issue on the merits. *See, Furnco Construction Corp. v. Waters, supra*, 438 U.S. at 577, 98 S.Ct. at 2949, citing and quoting *Teamsters v. U.S.*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Martinez v. El Paso County*, 710 F.2d 1102 (5th Cir.1983); *Wall v. National Railroad Passenger Corp.*, 718 F.2d 906, 908–909 (9th Cir.1983); *Williams v. S.W. Bell Tel Co.*, 718 F.2d 715, 717 (5th Cir.1983); *Constar Inc. v. Plumbers Local 447*, 568 F.Supp. 1440, 1447 n. 9 (E.D.Cal.1983).

Preference of males over females, or whites over blacks, is textually forbidden by Title VII. That preference in transfer opportunities by an employer may be a violation of the Act. *Bremer v. St. Louis Southwestern R.R. Co.*, 310 F.Supp. 1333, 1335, 1339 (S.E.Mo.1969). *Accord, Harris v. Richards Manufacturing Co., Inc.*, 511 F.Supp. 1193, 1204 (W.D.Tenn.1981), as modified, 675 F.2d 811 (6th Cir.1982); and *Local 246 v. Southern Cal Edison*, 320 F.Supp. 1262 (C.D.Cal.1970). The Third Circuit has held that in matters of promotion and transfer, the plaintiff need only show that the employer acted deliberately, rather than accidentally. *Kober v. Westinghouse Electric Corp.*, 480 F.2d 240, 246 (3d Cir.1973).

■ If a plaintiff from a protected minority shows that she therefore suffered disparately harsher treatment during employment, such a preference of males over females is a violation of Title VII. *Lowry v. Whittaker Cable Corp.*, 348 F.Supp. 202 (W.D.Mo.1972), aff'd, 472 F.2d 1210 (8th Cir.1973).

The plaintiff, a black female, was treated differently than other employees who were not black females. She was singled out for critical and job-threatening performance reviews upon return from every major legitimate and authorized absence for illness, when the employer was well aware that the illness (stress), was job-related and was worsening to depressive anxiety. These performance reviews were more frequent, severe, and critical than those received by other employees not within the protected class. She was denied consideration for transfer in violation of written company policy. Contrary to company policy, she was never offered long-term sick leave to recover fully so as to be able to meet job requirements. Ultimately, she was fired, shortly after an acknowledgment that her work was satisfactory.

■ The dispute at trial was really on the second part of *Furnco, supra*, viz., that plaintiff should establish by a preponderance that this was "because of race, sex . . .". Direct evidence of forbidden motive is very rare and is not required.

The evidence shows that plaintiff was treated more severely in the matter of attendance, both regarding absences (whether excused or not) and tardiness, than were employees who were not black females.

In *Brown v. A.J. Gerrard Mfg. Co.*, 643 F.2d 273 (5th Cir.1981), aff'd on reh., 695 F.2d 1290 (1983) (en banc), plaintiff Brown was a black male and his evidence showed the employer defendant was more severe on his attendance record than on white employees, and fired Brown on this pretextual excuse. The Court of Appeals ordered judgment for the plaintiff for back pay and affirmed and restored this award after further proceedings. 695 F.2d 1290 (11th Cir. 1983) and 715 F.2d 1549 (11th Cir.1983).

The plaintiff's supervisor, John Bryant, testified that he kept special time notes or records on June Graham which he had never kept on other employees in his 18 to 22 person department (T. 16) from 1976, when he took over, to his retirement after the plaintiff had been fired in 1983 (T. 48–59). As a result, he turned in "performance reviews" on plaintiff which faulted her for being five minutes late (T. 48, PX 22, T. 51, 52 PX 27) on a number of days in a department where this was unremarkable (Ruth Miller, T. 165–166). Supervisor Bryant

filed absence reports against plaintiff which inflated her absence record by computing for criticism as ordinary or undifferentiated or unexcused absences periods when the plaintiff was on grief and burial leave for her child, and fully authorized and excused sick leave under company policy (T. 55). The majority of the absences plaintiff was severely faulted for were in fact fully excused for grief or illness under written company policies (PX 27, end table, T. 55, 56). It must be remembered that, though the "performance reviews" contain remarks indicating some suspicion of plaintiff's *bona fides* (see, for example PX 27, T. 54), it was admitted that there was no element of malingering involved (T. 54, 55, see especially T. 142, 141; see also T. 170).

The white male employee of the department, Milner, was not faulted for sick leave absences (T. 67, 68) and the white female employee, Ruth Miller, was not "nit-picked" for tardiness when mental and emotional stress caused her to fall under performance review.

The only two employees of the department who were ever faulted for *excused* as well as *unexcused* absences were June Graham, the plaintiff, and Marilyn Hall (T. 67); both were discharged and both were black females (T. 69–70). Marilyn Hall was similarly "nit-picked" for minor tardiness by supervisor Bryant (T. 62, 64, 66; see also DX BB, T. 61), and reported for having x-rays taken (T. 64) and for leaving her desk to give blood in the company blood drive (T. 65). Marilyn was even reported for *suspicion* of minor lateness (T. 65).

The performance review rating system on which plaintiff was rated as sometimes having less than satisfactory work performance is suspect under the tests of the cases cited as being capable of lending itself to bias abuse and lacking in objectivity.

In the rating system used, plaintiff was not compared with other employees in the same division, nor in the same job/salary grade, by any objective or blind formula for performance. She was not rated independently by several supervisors or colleagues. The system called for her immediate supervisor, John Bryant, to translate his opinion of verbally stated conclusions into a number rating (PX 29), and this was reviewed by his supervisor on the way through the Personnel Department to June Graham's file. The courts have identified such rating systems as seriously suspect factors in considering indirect evidence of forbidden bias in employment practices and decisions. See *Wang v. Hoffman*, 694 F.2d 1146, 1148 (9th Cir.1982); *Loiseau v. Department of Human Resources*, 567 F.Supp. 1211, 1215–1216 (D.Ore.1983).

As in *Loiseau*, the second reviewer knew the first reviewer's rating, and this made any independent, different, or objective review highly unlikely. See 567 F.Supp. at 1215. Here, as there, though the subjective criteria of the system made it very suspect as a "convenient pretext for discrimination", 567 F.Supp. at 1216, the employer made no attempt to show other cases or evidence to lend some validity to its rating system.

A disquieting aspect of the whole "rating" system in June Graham's case is that, while there are several notes and performance review documents in her file from her supervisor, John Bryant, which indicate her work performance was from time to time unsatisfactory or below a .03 performance, the Company's permanent computer record on June Graham for her entire period of employment shows frequent performance ratings of .03 or satisfactory and not a single unsatisfactory work performance rating. Though there was some effort to have Rita Owen explain that the *ad hoc* notes of John Bryant were more important, John Bryant's contemporary notes to the Personnel Department show that he understood his notes were merely input, and the real records were more permanent (PX 25). The only record more permanent and higher than these *ad hoc* notes is the *Employee Master Data Form* (PX 13).

The fact remains that it was Bendix that chose to call its computer data printout forms for every employee's record the BENDIX EMPLOYEE MASTER DATA

FORM, and that these showed the plaintiff with numerous .03 satisfactory ratings and never anything less (T. 146–150; PX 13). It is easier to believe that Bendix did not put Mr. Bryant's critical assessments of June Graham's performance into her permanent record because they had reservations about these than it is to believe that the EMPLOYEE MASTER DATA FORM was not really the master record. There is no blinking the fact that Bendix relied heavily on some of its personnel records to try to articulate a non-discriminatory reason, viz., poor performance, for their severe monitoring and discharge of plaintiff, but other Bendix personnel records of facially greater dignity flatly contradicted the records they relied on, for the same point and for the same periods of time.

■ If in fact gender or race based bias is a contributing factor in an employer's decision to terminate, *Burdette v. FMC Corp.*, 566 F.Supp. 808 (S.D.W.Va.1983), impermissible discrimination exists even if other legitimate reasons could be found in the record. See *Wang, supra,* 694 F.2d at 1148, n. 2.

■ Where the employer departs from its own written general policies and treats a plaintiff more severely than other employees, this is competent evidence that the employer's stated reasons for penalty to or discharge of the employee are pretextual attempts to put an acceptable face on the practice of discrimination. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 804–805, 93 S.Ct. at 1825.

Here there was a departure from written policies which were being applied to white males at this time to help them with similar problems. The attempt to claim the existence of unwritten but allegedly fundamental policies, which were subjective as a cover or excuse for these differences in treatment will not stand scrutiny. The attempt to claim and rely upon these unwritten and non-specific policies (which were never clearly stated except as covering and excusing this case), casts valuable light on the credibility-pretext issue.

The booklet in which the employer, Bendix, explains itself, its policies and practices, to its employees and others legitimately interested, is in evidence (DX Q). It summarizes Bendix policy on transfers as one of moving people into jobs for which they are best qualified (T. 143–144). In the actual policy book itself, policy 1205, paragraph 5, that is, an employee so situated was not to be held to a task beyond them until discharge could be imposed, but was to be placed in another suitable position (DX L). Plaintiff had been initially able to perform the duties of the lone (T. 17) pivotal general clerk in Technical Publications (T. 26). This job was complex and hectic (T. 20, 22–24), with frequent shifts of focus (T. 160). Beginning with the illness of her son, Terrance, in August 1979, and as that illness worsened through hospitalization (PX 3, PX 4), through open heart surgery, a temporary rally, and ultimately his death on March 21, 1980, plaintiff developed illness of her own in the form of stress which worsened to anxiety and anxiety depression. This impaired her capacity to carry the high pressure work she was doing. This was medically documented (PX 3, 4, 5, 8, 9, 10, 11) at the time and fully shared with Bendix, these exhibits coming from their files.

This illness was job related and impaired her ability to perform her rather high pressure job (PX 5, 8, 9, 10); defendant's own doctor concurred (PX 1, second examination, November 24, 1980). He doubted the plaintiff's ability to carry on.

The plaintiff's boss, Bryant, saw plaintiff's health at risk and breaking in her present job assignment, and he warned his supervisors of this in writing more than once (PX 33, T. 59, T. 60, T. 112; PX 32). Mr. Bryant knew the plaintiff could have satisfactorily filled a less pressured clerkship, even in her stress periods (see his report to this supervisors, November 1980, PX 29, page 8, next to last paragraph), and so advised management. Ruth Miller, a co-worker, agreed (T. 170).

The plaintiff, June Graham, requested transfers on at least five occasions: Janu-

ary 22, 1980 (T. 56); February 28, 1980 (T. 56); October 13, 1980 (T. 57); November 26, 1980 (T. 57); and December 12, 1980 (T. 57) (PX 31).

On February 11, 1981 (PX 32), Supervisor John Bryant notified his superiors in writing of the plaintiff's continuing and increasing desire and need for a transfer (PX 32, p. 3). Supervisor Bryant repeated this yet again, with his earnest recommendation that it be granted, on February 27, 1981, in the following language:

> ... personnel should do everything possible to transfer her to a job with less pressure. ... I must state that I am worried about the job affecting her health. I just don't know how long she can maintain the current pace before it may affect her performance and health. She still wants a transfer .... (PX 33; see also T. 59, T. 60; T. 112; see further T. 104–105.)

During this period Plaintiff also appealed to Mr. Detweiler, John Bryant's superior (T. 60), and directly to the Personnel Department (T. 60). In March of 1981, Supervisor Bryant was still pushing the matter of plaintiff's transfer (T. 226). As the examination of Supervisor John Bryant by Bendix's attorney shows (T. 226, lines 2–5), John Bryant was and had been trying to get Bendix to apply the procedure of paragraph 5, policy 1205 (PX L; T. 137), which called for an employee flagging in job performance to be transferred to a suitable position they could perform, if possible, before termination was resorted to.

As noted, policy 1205 directs that an employee with unsatisfactory job performance be transferred to a suitable job they can perform if possible before the expedient of termination is applied. The executive from personnel in charge of plaintiff's file and Bendix representative at this trial, testified: "She was not considered for transfer *based on* the fact she did not have a sustained record of satisfactory work performance" (T. 131; see also, T. 177, 181) (emphasis added). The plaintiff was repeatedly told her requests for transfer were futile until she had established a long record of

satisfactory performance at the job. She, her supervisor, her doctor, and the company doctor knew, and warned the company that she could not sustain at that level for a long period without risk to her health, a risk which might make any job performance impossible.

This is a direct violation of Company Policy 1205. The company showed no evidence of ever having applied this practice to any employee other than this plaintiff. Though the company policy itself insisted that there was to be *no* deviation from this policy without express written approval of high level management, no such approval was sought or given here (Tr. 138–139).

The efforts of the defendant to deny this violation of defendant's own policy are evidence of the pretextual nature of these excuses.

These begin with the attempt to silence the inquiry by a flat denial from the authoritative witness, Owen, that there had been any deviation from this, or any policy at all, in plaintiff's case (T. 139). This must be judged in light of the express words of policy 1205 (T. 137; DX L), and the specific evidence to the contrary detailed above from the defendant's records and witnesses as well as plaintiff's.

Defendant tried to suggest that plaintiff had never filed the correct form to initiate the transfer process (T. 152–153; T. 177–178). It is plain, however, that the plaintiff left no stone unturned to secure a transfer (see evidence above), and even her supervisor believed the request was proper. Finally, plaintiff simply admitted she was never considered because she didn't have a satisfactory work record—the very condition necessary to trigger transfer consideration under the words of policy 1205 (T. 177, 182).

During this same period, two white male employees had been given Company arranged transfers when their health caused them to be unable to perform in their assigned slot. First, Personnel Executive Owen tried flatly denying that these two white males were unable to perform or had

unsatisfactory performance ratings when they were transferred (T. 131–132–133); however, she conceded when pressed that the facts were otherwise, as the written records (DX FF and DX GG) show. She testified that GG's problem was physical, apparently attempting a distinction (not reflected in 1205) between physical and mental or emotional impairment (T. 126), but had finally to admit the specific facts were contrary.

Against the fact that two white males who could not perform their jobs satisfactorily because of health problems were offered and given transfers to less demanding posts, the plaintiff was denied consideration for such transfer, though requested, and forced out through termination.

Defendant claims it was a fundamental company policy that nobody could be considered for transfer unless they had a long period of satisfactory performance in their present job, and that there was another fundamental company policy that long service employees were eligible for such transfers while short service employees were not (T. 151). These "policies" were at best ill defined. The witness, Owen, did not say how long one had to be with Bendix to receive preferment, and was uncertain whether the "policy" required six months or a year of satisfactory performance before one became eligible for consideration for transfer (T. 182).

The alleged oral policies contradict the specific written policy on the same subject, and that written policy has a clause forbidding deviation from it without prior written high level approval which was neither sought nor given in this case.

These "policies" were claimed to be "basic" (T. 182, line 3; T. 185, lines 19–25), and deal with fundamental personnel matters of seniority preferment and transfer. In a company the size of Bendix, where these matters are "fighting" issues for labor, and where there is a carefully written large policy book, those alleged "policies" had never been put in writing (T. 153–154; T. 185–186). In a case documented with 75 written exhibits, mostly from Bendix files, there is not a single reference or trace in all these written exhibits to those vital alleged "policies".

Policy 1717, at D3 (DX O, T. 140), applied if Bendix had taken the view that plaintiff was disabled to perform work by illness. While Bendix conceded that the plaintiff was not a malingerer (T. 142, and did some investigation (PX 28), the Personnel Department notes on this inquiry show on their face that part of them were never preserved or produced.

Under policies 1717 and 1105 (DX P; T. 142), an employee disabled from adequate job performance by a health problem was not to be fired, but was to be given short term (and, if need be, long term) leave. This, so that the employee could regain her health and capability to perform, and then *every effort* was to be made by Bendix (DX P, see p. 12, and T. 142–143), to restore the employee to her former or similar position.

In fact, Bendix knew plaintiff was suffering stress and anxiety depression and that her job was affecting her health and performance capability. Their own physician warned them (PX 1, second exam), as did her foreman. The curative benefits of these policies, which had been extended to white male foreman FF (DX FF) were not given to plaintiff on her return from her second sick leave in November 24, 1980, or thereafter. No effort was made by Bendix to offer or apply this policy to plaintiff. Instead, she was sent directly back to the job that was threatening her health; confronted with the added stress of an immediate severe performance review; and told repeatedly she was not eligible to be considered for transfer until she could perform that job satisfactorily for a long period (Y. 131, 177, 182).

The record is bare of any explanation as to why plaintiff was so treated. The inference that she was denied the normal treatment because she was a black female is reasonable under all the evidence.

The seminal case of *McDonnell Douglas v. Green, supra,* teaches at page 804 that, where white employees and black employ-

ees have the same job difficulties, and the white employees are retained while the black employees are terminated, this is good evidence to establish discrimination. This lesson was applied in the sex discrimination clerical case of *Martinez v. El Paso County*, 710 F.2d 1102 (5th Cir.1983).

█ The Seventh Circuit cases hold that a plaintiff need not show that she was a perfect employee or even that her performance was average to prevail. *See,* e.g., *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1283 (7th Cir.1977). But *Flowers* holds that where, as here, an employee under work criticism makes a satisfactory rating and shortly thereafter is fired, an inference arises that factors other than prior unsatisfactory performance—factors forbidden by Title VII—were involved. Here, plaintiff was rated as satisfactory on February 27, 1981; fell ill at her job March 18, 1981 (T. 101, 163); reported to the hospital March 19, 1981 (PX 11); filed her discrimination charge March 23, 1981 (PX 15); and was terminated effective March 30, 1981 (PX 14) (though John Bryant testified he had moved to terminate her sometime after March 19, 1981 and before the charge was filed March 23, 1981). This case is within the *Flowers* principle, *supra.*

There was no documentation of complaint about plaintiff's work made during the brief period after she was rated satisfactory and before the company moved to discharge her after she left the job in illness on March 19, 1981. The request for termination was dated March 30, 1981.

Another test for the presence of discriminatory action which is appropriate to this case is given by *Burdette v. FMC Corp.*, 566 F.Supp. 808 at 817 (S.D.W.Va.1983), where the court looked at what was in fact done, holding that one can infer discrimination in a sex discrimination case from the different treatment an employer meted out to a female secretary and a higher echelon male employee.

In this case, the black female plaintiff was given major, authorized sick leave twice. The first occasion was the illness and open heart surgery of her infant son, Terrance. That leave ended January 18, 1980 (T. 29, PX 4). The plaintiff was not due for a regular performance review until she had been on the job a year, which would have been February 12, 1980 (T. 144, DX Q; PX 2; T. 25), but within the first week of her return the employer confronted her with a severe full performance review and an unsatisfactory job performance rating. Again, as her stress worsened, plaintiff took an authorized disability illness leave September 23, 1980 (PX 8) through November 21, 1980 (PX 9, 10, T. 36, PX 28, T. 38). When she returned to work on November 24, 1980, she was examined by the Bendix physician who warned of her fragile health (PX 1, second exam) and found it to be questionable whether plaintiff could resume her duties in light of her condition, now worsened to anxiety depression. Despite this, plaintiff was sent back to work and two days later was again confronted with another full performance review and unsatisfactory job performance rating (See PX 29, dated November 26, 1980).

Instead of being the annual reviews contemplated by general policy, the reviews were invoked immediately every time plaintiff returned from a major, authorized leave. White male employees who took similar leaves in the same shop were not performance reviewed immediately on their return (T. 107, T. 165). In fact, no other employee ever met with an unsatisfactory job performance rating on return from major leave for illness or grief from the time Bryant became foreman in 1976 to his retirement May 31, 1983 (T. 47, T. 69).

Bendix attempted to explain this unique timing by Bryant's explanation that he had intended to review plaintiff *before* she went on leave, but had delayed until her return because he did not want to increase or aggravate the pressure and stress upon her (T. 32). It is difficult to credit this, because Bryant persisted in the extensive review procedures immediately following plaintiff's return after the doctor warned him she was suffering heavy stress (T. 32, PX 5, January 28, 1980, return from first leave).

Light is further cast on this episode by the fact that plaintiff's Employee Master Data Form (PX 13) shows her as an .03, satisfactory employee from January 26, 1980 to February 15, 1980, when this "performance review" was carried out (PX 19, January 22, 1980).

Bendix knew that the pressure of the post plaintiff held was giving her stress. She asked them repeatedly for a transfer, and she could have done a less stressful clerk's job, but they refused to consider her for any transfer. When the illness put her on sick leave, they met her on return with unsatisfactory job ratings and full performance reviews that increased the pressure and stress.

Plaintiff's performance reviews indicate that her work was being combed for every possible flaw, and each of them reported in the light most unfavorable to the plaintiff. For example, the failure to transmit some small checks was noted down seriously but ambiguously. Few lawyers' desks and files would have fared so well in a similar review. Plaintiff's absences were reported in gross so that, though the majority were excused sick and grief leave, they might appear as illness.

The January 22, 1980 review said that "during the last 3 months she has been warned on conversation and time away from the job. This has not improved" (PX 19, page 4). This gives an impression of 3 months of wilful idleness. The fact is that for most of the two months prior to these comments, plaintiff had been on sick leave to take her infant son to Mayo's for open heart surgery (See PX 3, 4, T. 29). In the words of the court in *Lindsey v. Angelica Corp. et al.*, 508 F.Supp. 363, 366 (E.D.Mo. 1981), the defendant first was not dealing squarely with the black female plaintiff, and as *Lindsey* holds, this outweighs the expectable *post hoc* explanations as to why white employees were treated better. It is further evidence of discriminatory motive.

Every tardiness was recorded and reported for criticism (See PX 22, and see T. 48, 49, 51; PX 27, T. 52). The department did not run to a time clock, but plaintiff was faulted for being as little as five minutes late on the basis of private notes kept by Supervisor Bryant (T. 48–49).

In this particular, there is one other employee in this department whose performance review records are similar to plaintiff June Graham's. This employee's record is DX BB (T. 61).

Like the plaintiff, this employee, a word processor, was singled out for criticism on severe performance reviews for excused as well as unexcused absences (T. 55, 56, and T. 64, DX BB). She was criticized for her x-rays made (T. 64) and for taking an hour to give blood in the company drive (T. 65). When an accident in the parking lot delayed her she was reported (T. 62 for being five minutes late. Every minor tardiness was reported (T. 62, 63, 64, 66). Even the suspicion of lateness was reported against her (T. 65). She was watched very closely (T. 63). Employee DX BB, Marilyn Hall, and the plaintiff, June Graham, were the only employees ever faulted for excused as well as unexcused absences (T. 67).

The spirit and motive of these "performance reviews" is made clear by the fact that Marilyn Hall (DX BB) was twice faulted in a termination proceedings for hanging her coat in the wrong foyer (T. 66). This court now renews its comments as to the "nit-picking" nature of this as shown at page 189 T.

This was in January 1980 when plaintiff was undergoing an equally severe review by the same boss (DX BB, PX 19). Both of these employees are black females (T. 77, T. 69–70).

The only other black female in the technical publications department was said to be Joan Evelyn (T. 213), the lead word processor, a senior person, and said to be well treated. Apparently she was entrenched in the department since 1974 (T. 214), well before John Bryant became supervisor of that department in 1976 (T. 68, line 24–25, T. 69, line 1). She was not produced as a witness, nor were her records introduced.

The Supreme Court stated clearly in *Furnco Constr. Corp. v. Waters, supra,*

438 U.S. at 579, 98 S.Ct. at 2950, that the duty not to discriminate is owed *each* minority employee, and discrimination against one of them is not excused because the employer does not discriminate against all of them.

Plaintiff has sustained her burden to show that this defendant employer was treating "some people less favorably than others because of their race and sex", *Furnco,* 438 U.S. at 577, 98 S.Ct. at 2949, and cases cited there; that she was so treated; that it cost her her job.

This court has had access to a full transcript of the trial held on February 6, 1984 in South Bend, Indiana.

This memorandum and the findings of fact and conclusions of law are meant to comply fully with Rule 52 F.R.C.P.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

### II.

### FINDINGS OF FACT

1. This court has jurisdiction under the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f)(3).

2. Plaintiff Graham, a black female, was an employee of Defendant Bendix, from February 12, 1979 until she was fired by Bendix effective March 30, 1981. Defendant was a covered employer, and plaintiff, holding the post of general clerk in technical publications, was a covered employee, under 42 U.S.C. § 2000e.

3. Plaintiff filed her initial discrimination charge (later amended several times) with the South Bend Human Rights Commission on March 23, 1981. It was proven and not contested that plaintiff carried out in proper, timely fashion all administrative and preliminary steps necessary to commence this case in this court, receiving her right to sue letter November 6, 1981 (PX 15).

4. Plaintiff claims she was discriminated against by Defendant Bendix, and was fired, on the grounds of race (black) and sex (female).

5. Plaintiff proved by a preponderance of the evidence that she had been treated less favorably than other employees who were not black females, because of her race and sex.

6. All of the findings of fact that are implicit in the memorandum entered herewith are now adopted as findings of fact here.

7. The parties stipulated (T. 6) that the amount of back pay lost by plaintiff after all proper set-offs and deductions in Defendant's favor is $34,260.11.

### III.

1. This court has jurisdiction under the provisions of Title VII of the Civil Rights Act of 1964.

2. The present case is a disparate treatment case under Title VII. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

3. The central focus of the inquiry is whether the employer treated this plaintiff less favorably than others because of her race and sex. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Furnco Const. Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

4. Deliberate preference by an employer of males over females or whites over blacks is a violation of Title VII, and this may include preference in transfer opportunities, *Bremer v. St. Louis Southwestern R.R. Co.,* 310 F.Supp. 1333, 1335, 1339 (E.D.Mo.1969); *Harris v. Richards Manufacturing Co., Inc.,* 511 F.Supp. 1193, 1204 (W.D.Tenn.1981), as modified, 675 F.2d 811 (6th Cir.1982); *Kober v. Westinghouse Electric Corp.,* 480 F.2d 240, 246 (3d Cir. 1973); and disparate harsher treatment during employment, *Lowry v. Whitaker Cable Corp.,* 348 F.Supp. 202 (W.D.Mo. 1972), aff'd 472 F.2d 1210 (8th Cir.1973).

5. Under Title VII, the plaintiff as a black woman is protected against discrimination on the double grounds of race and sex, and an employer who singles out black females for less favorable treatment does not defeat plaintiff's case by showing that white females or black males are not so unfavorably treated. *Jefferies v. Harris Cty. Community Action Assn.*, 615 F.2d 1025, 1032–1035 (5th Cir.1980). The duty not to discriminate is owed *each* minority employee, and discrimination against one of them is not excused by a showing the employer did not discriminate against all of them, or there was one he did not abuse. *Furnco v. Waters*, 438 U.S. 567, 579, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

6. Where plaintiff shows less favorable treatment of herself than of similarly situated employees not members of her protected minorities, and defendant seeks to articulate legitimate nondiscriminatory reason for its treatment of plaintiff, the Court must decide whether plaintiff proved by a preponderance of the evidence that the defendant's alleged non-discriminatory reasons were pretextual covers for discrimination. *United States Postal Service etc., v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Both direct and indirect evidence may be considered. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

7. Among the types of employer conduct from which an inference and finding of discriminatory motive may arise are, treating the minority employee more severely than non-minorities in standards of attendance, *Brown v. A.J. Gerard Mfg. Co.*, 643 F.2d 273 (5th Cir.1981), 695 F.2d 1290 and 715 F.2d 1549 (11th Cir.1983); use of a suspect performance rating system, *Wang. v. Hoffman*, 694 F.2d 1146, 1148 (9th Cir.1982); *Loiseau v. Dept. of Human Resources*, 567 F.Supp. 1211–1216 (D.Ore.1983); treating minority employees more harshly in discharge and retention decisions than nonminorities, *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Martinez v. El Paso County*, 710 F.2d 1102 (5th Cir.1983); treating minority employees more severely as to standards of performance, *McDonnell Douglas, supra*, 411 U.S. at 804, 93 S.Ct. at 1825; *Lowry v. Whitaker Cable Corp., supra;* employer departing from its written policy applied to non-minorities to treat a minority plaintiff more severely, *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 804–805, 93 S.Ct. at 1825; the employer's use of evidence unworthy of credence to support its proffered explanation of the different treatment, *Texas Dept. v. Burdine, supra*, 450 U.S. at 256, 101 S.Ct. at 1095; and finally, the situation where a health impaired non-minority employee is transferred to another job his health will permit him to perform, and a minority plaintiff is denied such a transfer. *Jones v. Glitch, Inc.*, 23 FED 313, 315 (N.D.Tex.1979), *aff'd mem.*, 634 F.2d 1353 (5th Cir.1980); vacated and remanded with a series of other Court of Appeals decisions right after *Burdine, supra*, to make sure the procedure requirements of *Burdine* had been met, 452 U.S. 912 (1981) (a problem not arising in this case under the *Aikens, supra*, procedural pattern) and so reconsidered, with plaintiff's award restored and certiorari denied in subsequent unreported decision. See also *Harris v. Richards, supra*, 511 F.Supp. at 1204.

Plaintiff proved by a preponderance that defendant's articulated suggested non-discriminatory reasons were pretextual, and that she was a victim of employment discrimination forbidden by Title VII of the Civil Rights Act of 1964.

8. The plaintiff need not prove she was a perfect employee, or even that her performance was average. *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1283 (7th Cir.1977). *Crouch* holds that where the worker, after difficulties, attains a satisfactory performance rating, and the employer moves quickly to discharge, an inference arises that earlier unsatisfactory work was not the true reason for discharge, but a pretext. Indeed, reviews and discipline and discharge of a minority plaintiff on a quicker time scale than for non-minorities

raises the inference of discrimination. *Lowry v. Whitaker Cable,* 348 F.Supp. 202 (W.D.Mo.1972). (These features likewise were proven by plaintiff in the present case.) An employer may fire an employee for poor work performance. But when gender-based bias is a contributing factor in an employer's decision to terminate, impermissible discrimination exists. *Burdette v. FMC Corp.,* 566 F.Supp. 808 (S.D. W.Va.1983), citing and relying on *Sprogis v. United Airlines,* 444 F.2d 1194, 1198 (7th Cir.), *cert. denied,* 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971).

9. All conclusions of law that are implicit in the memorandum entered herewith are now adopted as conclusions of law here.

10. Plaintiff is entitled to the award of back pay in the amount stipulated by the parties.

## IV.

### JUDGMENT

In accord with the findings of fact and conclusions of law as outlined above, judgment shall enter for the plaintiff, June Graham, and against the defendant, The Bendix Corporation in the amount of $34,-260.11. Each party will bear its own costs. Counsel for plaintiff shall file his affidavit for counsel fees in specific detail under 42 U.S.C. § 1988 by May 7, 1984, to which the defendant shall file objections and any counter-affidavits by June 2, 1984.

SO ORDERED.