Mary S. ROSEMOND, Plaintiff,

v.

COOPER INDUSTRIAL PRODUCTS, A DIVISION OF COOPER TIRE AND RUBBER COMPANY, Defendant.

Civ. No. F 84–393.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

July 9, 1985.

Christopher C. Myers, Wilks & Kimbrough, Fort Wayne, Ind., for plaintiff.

J. Michael O'Hara and Thomas A. Herr, Barrett, Barrett & McNagny, Fort Wayne, Ind., for defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial held June 17, 1985 through June 18, 1985. The court, having examined the entire record and having determined the credibility of the witnesses after viewing their demeanor and considering their interests, hereby renders and enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

Plaintiff Mary S. Rosemond (Rosemond) is a black, American female, residing in Fort Wayne, Indiana. The defendant Cooper Industrial Products (Cooper) is a division of Cooper Tire and Rubber Company, employing more than fifteen people and operating a plant in Auburn, Indiana. Alice Aldrich (Aldrich) is an employee of Cooper and was at all material times Supervisor of Data Processing. Aldrich was the person at Cooper who decided to hire Rosemond and decided, in part, to terminate the plaintiff's employment with Cooper.

Cooper employed Rosemond at the Auburn, Indiana plant from December 27, 1982, through August 26, 1983. Cooper hired Rosemond as a computer operator. Although a written job description existed at the time of Rosemond's interviewing and hiring, Cooper did not provide Rosemond with a copy of the job description. According to the job description, the job of computer operator at Cooper involves the performance of on-line and off-line duties. Rosemond worked in the Data Processing Department of Cooper. During Rosemond's period of employment with Cooper, Rosemond performed only off-line duties.

In October of 1982, Aldrich sent a personnel requisition to the Cooper personnel office, requesting the hiring of a computer operator to replace Margaret McCorkle, who was retiring on December 27, 1982. Aldrich stated that the minimum qualification required for the job of computer operator at Cooper was one year's experience on a multi-processing computer. The job opening at Cooper was advertised in the Fort Wayne newspapers. Rosemond saw the ad and applied for employment at Cooper as a computer operator in October of 1982. Seven people applied for the open position. Rosemond was the only black applicant. Aldrich hired Rosemond for the open position because Rosemond was the best qualified for the job of the seven applicants who applied.

Rosemond possessed substantial credentials in the area of computer operation and key punch both in terms of education and work experience. Rosemond possessed a college degree and a business diploma from International Business College, Fort Wayne, Indiana. Rosemond's courses at International Business College included data processing, typing, stenography and key punch. Rosemond received a diploma from International Business College, graduating in the top third of her class, in 1964. In 1978 and 1979, Rosemond completed, at Indiana/Purdue University, Fort Wayne, Indiana, sixteen hours of computer concentration courses in the areas of commercial systems, computer systems analysis and systems programming. During those sixteen hours of courses, Rosemond received training in the operation of the following computer systems: IBM 360, IBM 370, IBM 158, Honey-well, CDC 6500, and NOVA 800. Rosemond performed well enough in her courses to receive tuition reimbursement from her employer International Harvester. In the years 1964–1982, Rosemond worked fourteen years as either a key punch and data entry operator or as a computer operator.

Rosemond worked at International Harvester from 1964–1967 and from 1973–1982. Rosemond's work record at International Harvester was exemplary. Rosemond advanced through the International Harvester system from a key punch operator to a computer operator by virtue of applying for higher positions, taking tests and qualifying for the higher positions. During Rosemond's three years at International Harvester as a computer operator, Rosemond was not reprimanded for any mistakes, either orally or in writing.

Rosemond possessed all the necessary basic skills to perform the job of computer operator at Cooper. Rosemond made it clear at the time of her hiring that she had not worked on computer equipment or computer related equipment for four to five years because of the elimination of computer operations at the Fort Wayne, Indiana International Harvester plant. Aldrich was aware that Rosemond had been away from the computer area when Aldrich hired Rosemond. Even with the fact that Rosemond had been away from the computer area for four to five years, Rosemond was by far the best qualified applicant for the job of computer operator at Cooper. Rosemond was the first black person hired by Aldrich; Aldrich had never worked with or supervised a black person. Rosemond was the only black office worker at Cooper; other minorities did work in the factory division at Cooper.

When Aldrich hired Rosemond as a computer operator at Cooper, Aldrich explained that Rosemond would work off-line duties for the first few months. Following those first few months of performing only off-line duties, Rosemond could expect to perform on-line duties and to be placed in rotation with the other computer operators as all the computer operators at Cooper perform both on-line and off-line duties. The job description of a computer operator at Cooper describes both on and off-line duties. At the time of Rosemond's application for employment as a computer operator at Cooper, Rosemond completed an employment application on which Rosemond stated that in addition to the job of computer operator, she was interested in performing the jobs of typist, key punch operator, accounting clerk, or secretary. Rosemond's skills and background qualified her for those other positions as well as qualifying her for the position of computer operator at Cooper.

Rosemond's first day of work was December 27, 1982. Rosemond's first day of work was Margaret McCorkle's last day at work. Rosemond replaced McCorkle as one of the three computer operators employed at Cooper. McCorkle had trained six or seven people in the job of computer operator at Cooper during her employment, both before and after job manuals were developed by Aldrich. It was customary that the outgoing computer operator would train the incoming computer operator in the specifics of the computer operator position at Cooper. Although McCorkle believed that she would have had the opportu-

nity to train Rosemond had she not become ill, Aldrich did not contemplate such training because Aldrich requested, in the October personnel requisition, that someone be hired as a computer operator to replace McCorkle as of McCorkle's retirement date: December 27, 1982. The off-line duties at Cooper involve many different jobs and many different tasks, some of which are quite complicated.

Cooper makes available to its computer operators a set of guidelines for operation of the Cooper system using Cooper's documentation. This documentation consists of processing guidelines, balance guidelines and distribution guidelines for each job processed. These job manuals are meant to be the primary means of training persons employed as computer operators at Cooper. Aldrich presented Rosemond with the location of these job manuals and the specific job manuals needed for the various jobs Aldrich expected Rosemond to perform. Aldrich meant for the job manuals to provide to Rosemond all the training and guidance Rosemond needed to perform adequately the job of computer operator at Cooper. Some of the job manuals meant to be utilized by Rosemond in performing her job were outdated or contained wrong information which caused various jobs to be incorrectly performed by Rosemond. The job manuals themselves were often hard to understand or to read as the job manuals were handwritten and sometimes somewhat cryptic. Aldrich managed by exception, not by personal supervision. Aldrich wanted to be notified only when there was a problem and did not want to be contacted to explain various jobs Aldrich expected Rosemond to perform.

One of Rosemond's co-workers, Cathy Smith, could not remember any amount of assistance being given to Rosemond on her first day with the exception of Aldrich explaining the first job to Rosemond. Aldrich's explanation consisted of Aldrich showing Rosemond the location of the manuals, the specific manual needed for the first job and the source documents or data Rosemond needed in order to perform her first job. Rosemond's co-workers, particu-

larly Cathy Smith, did, at first, answer questions Rosemond poised, but each co-worker had a full time job to perform and did not always have the time to answer Rosemond or to assist Rosemond. Computer operators at Cooper operate under time pressures and schedules. Aldrich assigned Rosemond to actual production jobs immediately upon her arrival; Rosemond was given no opportunity to practice or observe other computer operators performing actual production jobs.

Computer operators working at Cooper basically learned their job by doing, by trial and error. Aldrich specifically informed Rosemond that she did not want nor welcome repetitious questions. Aldrich believed all the jobs were interrelated such that questions on different jobs were defined by her as repetitious if she felt the questions related to similar phases of the different jobs. All of the computer operators at Cooper had problems at some time in performing correctly the various jobs required of them.

Rosemond initially experienced difficulties in performing the various jobs required of her as a computer operator at Cooper. At the end of February 1983 Aldrich determined that something needed to be done to improve Rosemond's job performance. On March 7, 1983, Aldrich conducted a meeting with Rosemond concerning the problems Aldrich felt Rosemond had in performing her job. At that March 7, 1983, meeting, Aldrich detailed for Rosemond some of what Aldrich found to be Rosemond's processing errors and performance problems. A written summary was prepared of the March 7, 1983, meeting and presented to Rosemond on March 8, 1983. The written summary of March 8, 1983, indicates that Aldrich was going to begin to keep a log of all questions asked by Rosemond in order to determine if Rosemond's questions were repetitious. Neither the discussion of March 7, 1983, nor the written summary of March 8, 1983, indicates that Aldrich planned on keeping any kind of log of errors committed by Rosemond from that time period forward.

In fact, beginning on March 8, 1983 and continuing through Rosemond's termination date of August 26, 1983, Aldrich compiled a listing, a log, of errors committed by Rosemond on the job. This log of errors was not a part of Rosemond's personnel file; Rosemond was never told of the existence of the log because Aldrich thought it was not relevant to inform Rosemond. Aldrich did not keep a log of performance errors on the other employees under her supervision during Rosemond's tenure. Aldrich never kept a log of a similar nature on any other employee under her supervision, even those employees, two in number, who were previously terminated by Aldrich for poor job performance, the ostensible reason articulated by Aldrich and Cooper for Rosemond's termination.

Although Aldrich noted a few errors of some of the other computer operators in the log, the purpose of the log was to document Rosemond's errors and the log itself contains nothing indicating anything Rosemond did well in the performance of her job, only those errors Aldrich determined Rosemond committed. Aldrich felt that from March of 1983 through August of 1983 ninety to ninety-five percent of all errors committed in the Data Processing Department by the three computer operators employed by Cooper were committed solely by Rosemond.

Aldrich continued being concerned about Rosemond's performance and consulted Pat Krick, the Personnel Director at Cooper, regarding what steps Aldrich should undertake. Krick recommended that a special performance appraisal review be performed on Rosemond in advance of her six month date. Such a special review was performed and covered the time period of December 27, 1982, through April 30, 1983. That performance appraisal was presented to Rosemond on May 17, 1983, along with a two page memo placing Rosemond on a three month probation. The performance appraisal provides that both the supervisor and the employee will conduct the performance appraisal and will rate the employee and make remarks.

In this special review Aldrich rated Rosemond in almost every category as unsatisfactory or meeting minimum requirements. In several categories, including enthusiasm toward job, attendance, attitude toward supervision, neatness, originality and written communications, Aldrich rated Rosemond as satisfactorily meeting the requirements of the job. Rosemond rated herself as satisfactorily meeting the requirements of the job or better. Rosemond made several comments on the special review which indicate Rosemond's desire to learn and to perform her job with efficiency and skill. Aldrich noted her belief that Rosemond did not logically think the processing through.

In the written memo, also presented to Rosemond along with her special review on May 17, 1983, Aldrich indicated that some improvement had been made on the problems articulated to Rosemond in the March 7, 1983, meeting, but that more improvement was needed. Aldrich again stated her expectation that Rosemond's basic skills should be better. The written memo of May 17, 1983, informs Rosemond that Aldrich does not believe that Rosemond meets the minimum requirements of the off-line computer operator position and that Aldrich will not consider training Rosemond to perform on-line duties until Rosemond has shown more improvement with off-line duties. Aldrich placed Rosemond on a three month probation period, indicating that a monthly review would be performed and that improvement in the following areas was required: (1) better knowledge of the flow of the data; (2) better understanding of the schedule; (3) improvement using the sorter; (4) improvement using the collater; and (5) improvement in following the instruction manuals. At no time during the May 17, 1983, meeting, did Aldrich inform Rosemond that the three month probation period led to termination if Rosemond did not improve to the level Aldrich expected. Rosemond was never informed that she was in danger of being terminated for unsatisfactory job performance.

Upon receiving the May 17, 1983, memo and the special review, Rosemond went to see Krick regarding the situation. Rosemond related to Krick the various problems she believed she was experiencing in performing her duties, including the problem of the lack of personal communication between Rosemond and Aldrich. Co-workers noted the lack of personal communication between Rosemond and Aldrich. Suffice it to say that the two simply did not get along on a personal level. Almost no communication passed between Rosemond and Aldrich excepting when Aldrich articulated a specific error to Rosemond. Rosemond's performance of her job was made more difficult by the lack of communication and guidance given to her by Aldrich. Aldrich was not always available to answer Rosemond's questions. After the May 17, 1983, discussion, Aldrich instructed Rosemond and the other computer operators that all of Rosemond's questions were to be directed to Aldrich and the other operators were not to answer her questions. Such an instruction compounded Rosemond's problems, such as they were, because Aldrich was not always available to answer questions and Aldrich's style of management did not include direct supervision.

During Rosemond's meeting with Krick, Krick told Rosemond of several job openings at the Cooper plant for which Rosemond could apply and interview. Such a process was not unfamiliar to Rosemond as the process of applying and interviewing is basically the same process Rosemond used while an employee at International Harvester. At International Harvester, no job is filled without a separate application and interview by the employee seeking that job. Rosemond was personally very familiar with the process because that process was how she obtained, on two separate occasions, the job of computer operator at International Harvester and because during the several year close down of International Harvester in Fort Wayne, Indiana, in order to remain employed at International Harvester, Rosemond continually had to apply and be interviewed for further positions.

At the time of Rosemond's meeting with Krick, Rosemond was somewhat open to the idea of transferring to another job in the Cooper plant, but informed Krick that she wanted a week to think about transferring and to think about her job in the computer department. Approximately one week later, Krick contacted Rosemond regarding transfer; Rosemond informed Krick that she felt she was doing better in her current job and would remain in the department. At no time was Rosemond offered a transfer as an alternative to termination nor was Rosemond kept personally or specifically informed of further openings at the Cooper plant for which Rosemond was potentially qualified. Rosemond's office skills were such that there were several jobs at the Cooper plant for which Rosemond was qualified and which Rosemond could have performed.

A monthly review of Rosemond's performance during the probationary period was not performed. A six month review was completed, covering the period December 27, 1982 through June 27, 1983. The appraisal was reviewed by Aldrich and Rosemond on June 24, 1983. At that time Aldrich rated Rosemond in the various categories as unsatisfactory, meeting minimum requirements, and satisfactorily meeting requirements of job. A comparison of the special appraisal, reviewed May 17, 1983, and the six month review, reviewed June 24, 1983, shows improvement in almost every category of Rosemond's performance in Aldrich's opinion. The majority of Rosemond's ratings by Aldrich on the six month review are in the minimum requirement category and most of the ratings in the unsatisfactory category have plusses following the unsatisfactory rating. In particular, Aldrich rated Rosemond as satisfactorily meeting the requirements of the job in the categories of composure and stability, self-confidence, enthusiasm, job perspective, attendance, attitude toward supervision, personal goals established, and most importantly, self-improvement program. Aldrich rated Rosemond's attitude towards others as often going beyond job

requirements. Aldrich's overall job attitude rating of Rosemond was in the category of satisfactorily meeting the requirements of the job with a plus.

Aldrich's overall performance rating of Rosemond was that of meeting minimum requirements with a minus. Such a rating is, at least arguably, an improvement from the overall performance rating of May 17, 1983 by Aldrich which was unsatisfactory with a plus. In any event, from the June 1983 rating, it is obvious that Rosemond met at least the minimum requirements for the performance of the job. Aldrich noted in the June review that it was not Rosemond's actual actions which concerned her, but Rosemond's inability, in Aldrich's opinion, to handle the job logically. Both of the reviews show the extreme difference in Rosemond's and Aldrich's respective opinions of Rosemond's performance on the job. The two opinions rarely coincide regarding Rosemond's performances and Aldrich consistently rates Rosemond lower.

Rosemond's performance improved during the period of her employment at Cooper. Aldrich believed that Rosemond's performance never improved and that Rosemond did not possess the basic skills or capabilities to perform basic data processing functions and further, that Rosemond did not possess the skills to learn and perform the specific requirements of the Cooper system. Rosemond's co-workers saw that Rosemond's work did improve while she was there and that Rosemond tried hard to perform her job satisfactorily. Rosemond possessed the basic skills to perform the job of computer operator and further possessed the skills to perform the specific duties required in operating the Cooper system.

A computer seminar was scheduled to be held for office employees of Cooper on several dates, including August 25 and August 26, 1983. Rosemond was originally scheduled to attend the computer seminar on August 25, 1983, by Krick's office. Computer operators are often rescheduled for such seminars due to the work load of the department. Aldrich determined that the work load was such on August 25, 1983, that Rosemond could not attend the seminar. Aldrich had already made the decision, as of August 25, 1983, that Rosemond was to be terminated at the end of her probationary period. In fact, Aldrich wanted to terminate Rosemond as of May 17, 1983, but, because of Rosemond's minority status, Krick instructed Aldrich to "go that extra mile," and give Rosemond a three month probationary period. The normal probationary period at Cooper is thirty days. Rosemond was never informed that extra time was being given to her to improve her job performance due to her minority status.

On August 26, 1983, a meeting was held at Cooper. Present at that meeting were George Marks, Aldrich's superior, Pat Krick, Alice Aldrich, and Mary Rosemond. Rosemond was informed that she was terminated for unsatisfactory job performance. The decision to terminate her had been made prior to the meeting. Rosemond was given two weeks' severance pay, asked to turn in her personal notebook regarding Cooper processes, gather her belongings and leave early. Rosemond was not given the option of attempting to transfer to another department, an option customarily given to employees at Cooper facing termination in a particular job. Cooper terminated Rosemond as of August 26, 1983. Rosemond's position remained open until filled by a white female.

Rosemond did feel, during her employment, that she was being discriminated against because of her race, but, on the whole, Rosemond enjoyed her job, enjoyed the people around her, and wished to remain as an employee at Cooper. Rosemond did feel singled out, to a degree, and did feel that social amenities were not extended to her on the same basis that they would have been extended had Rosemond been white. Rosemond experienced feelings of isolation. Rosemond did not have any racially derogatory remarks made to her nor did she overhear any remarks during her employment.

The parties have entered into two stipulations on the matters of damages for back pay, lost fringe benefits and plaintiff's attorney fees, should plaintiff prevail.

*Conclusions of Law*

The court has jurisdiction over the subject matter of this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and under § 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. The court has jurisdiction over the parties. Defendant Cooper, is an employer within the meaning of Title VII of the Civil Rights Act of 1964.

This is a claim under Title VII of the Civil Rights Act of 1964 for employment discrimination on the basis of race and a claim under § 1981 of the Civil Rights Act of 1866 for discrimination on the basis of race. The plaintiff Rosemond is a black female person. This is a disparate treatment case.

Rosemond has the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff[.]" *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The framework of analysis of Title VII claims is well established.

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973)). *Accord United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

With regard to the prima facie showing, the plaintiff burden at the prima facie phase of analysis is to prove the relative objective qualifications of the job at issue. *Jayasinghe v. Bethlehem Steel Corp.*, 760 F.2d 132, 135 (7th Cir.1985). "By removing subjective job requirements from the prima facie phase of analysis, the plaintiff may create a rebuttable presumption of discrimination without direct proof of subjective intent." *Id.* In the second phase of analysis, the defendant is given the opportunity to articulate some legitimate, nondiscriminatory reason for its employment action. "The purpose of this evidence is to 'allow the trier of fact rationally to conclude that the employment decision [was not] motivated by discriminatory animus.'" *Coates v. Johnson & Johnson*, 756 F.2d 524, 531 (7th Cir.1985) (quoting *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096). *See also Nellis v. Brown County*, 722 F.2d 853, 857–58 (7th Cir.1983). The third phase of analysis, if reached, requires that the plaintiff attempt to persuade the court that the defendant's explanation is "unworthy of credence" or that "a discriminatory reason more likely motivated" the defendant. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The plaintiff always retains the ultimate burden of persuasion. *Id.*

"[C]ourts often must rely on circumstantial evidence of employer motivation in employment discrimination cases." *Hearn v. R.R. Donnelley & Sons Co.*, 739 F.2d 304, 306 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1214, 84 L.Ed.2d 356 (1985). A district court cannot require a plaintiff to submit direct evidence of discriminatory intent. *Aikens*, 460 U.S. at 714, n. 3, 103 S.Ct. at 1481, n. 3 (quoting *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977)). *See also Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095 ("The plaintiff retains the burden of persuasion. [H]e may succeed in this either directly by persuading the court that a discriminatory reason

more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."). The question to be decided in a Title VII case is the "ultimate question of discrimination *vel non.*" *Aikens*, 460 U.S. at 714, 103 S.Ct. at 1481. "The factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff. The district court must decide which party's explanation of the employer's motivation it believes." *Graham v. Bendix Corp.*, 585 F.Supp. 1036, 1038 (N.D.Ind.1984) (citing *Aikens*, 460 U.S. at 715, 103 S.Ct. at 1482).

*Aikens* directs that a district court should reach the central focus of a Title VII case and decide the discrimination issue on the merits. "The central focus of the inquiry in a case such as this is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (quoting *Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15). *See Aikens*, 460 U.S. at 715, 103 S.Ct. at 1482; *Graham*, 585 F.Supp. at 1038–39.

■ Where the district court has heard and received all of the evidence in a case, there is no reason to determine whether plaintiff has actually made a prima facie case of discrimination. *Aikens*, 460 U.S. at 714–15, 103 S.Ct. at 1482; *Suson v. Zenith Radio Corp.*, 763 F.2d 304, 307 (7th Cir. 1985). Cooper has articulated a legitimate nondiscriminatory reason for Rosemond's discharge. The resolution of this case turns on the determination by this court of whether Rosemond has shown that the reason given was merely pretextual. Rosemond can counter Cooper's defense in one of several ways: she can show that others were not fired for a similar reason or she can show that the "reason was simply not worthy of belief." *Suson*, at 308.

■ As a matter aside, the court concludes that Rosemond has indeed satisfied the criteria of a prima facie case as articulated in cases involving race discrimination suits arising out of termination. Rosemond is a member of a protected group; she is extremely qualified by education and experience for the job of computer operator at Cooper; she satisfied the normal requirements of her job such that her performance was of sufficient quality to merit continued employment; Rosemond's employment was terminated by Cooper; and, the position of computer operator remained open after Rosemond's termination and was filled by a white female. Rosemond carried her initial burden of proof in establishing, by objective criteria, a prima facie case, thereby creating a rebuttable presumption that Cooper unlawfully discriminated against her. Again, the court notes that its conclusion of whether Rosemond established a prima facie case is irrelevant to the ultimate question of discrimination *vel non* in this case. *Aikens*, 460 U.S. at 714–15, 103 S.Ct. at 1482.

Cooper articulated what it felt was a legitimate nondiscriminatory reason for its decision to terminate Rosemond. That ostensible legitimate nondiscriminatory reason was plaintiff's poor work performance. Cooper articulated that reason more specifically as Rosemond's absolute inability to perform basic skills, such as operating a collator machine or a sorter machine. Cooper stated that Rosemond was unable to grasp the minimum basic thought processes associated with the computer operator position at Cooper. To support its articulated reason for its decision to terminate Rosemond, Cooper relied on the personal private log of errors compiled by Alice Aldrich on Mary Rosemond, covering the time period of March of 1983 through August of 1983. Cooper also noted that two other persons, both white, had been terminated by Cooper in the identical position Rosemond held for the identical articulated reason of poor job performance. Cooper also pointed to the two performance appraisals conducted regarding Rosemond's work, both of which were subjective appraisals, completed by her immediate supervisor with no independent check

of Rosemond's performance on the job. Finally, Cooper noted that ample opportunity and time had been given to Rosemond to improve her job performance and that Rosemond's probationary period had been lengthened in order to "go that extra mile," because Rosemond was a minority.

Rosemond presented much evidence at trial to prove to this court that the articulated ostensible legitimate nondiscriminatory reason of Cooper was a mere pretext for race discrimination. Cooper's articulated reason is simply not worthy of belief. The evidence is ample and clear that Rosemond possessed not only the basic skills of an entry level computer operator regarding the performance on machines such as the collator and sorter, but also that Rosemond possessed advanced skills. Rosemond acquired the extensive skills she holds as a computer operator both through education and experience. Rosemond had performed exemplarily at every job she had held prior to her employment at Cooper. Rosemond was industrious and hard working. Rosemond was honest with Cooper that she had been away from the computer area for several years, but demonstrated to Cooper that she was very willing to learn.

The evidence demonstrates that Rosemond did not perform her duties as a computer operator at Cooper as a perfect operator or even as an above average operator. It is further true that Rosemond made errors in the performance of her duties. These errors were largely caused by the virtual lack of training given Rosemond. The manuals presented to Rosemond as her guide were often outdated and, being hand written, often hard to read. The manuals were often wrong. Cooper credited Rosemond with errors caused by the fact that the Cooper manuals given Rosemond were wrong. Rosemond improved her work performance as the months went by. Rosemond's supervisor testified that Rosemond never made any improvement while at Cooper, but Aldrich's own marks on Rosemond's performance appraisals indicate that Aldrich concluded that Rosemond did improve and was trying hard.

The performance appraisals done on Rosemond show that Rosemond was meeting, at least as of June 24, 1983, the minimum requirements of the computer operator job at Cooper. She was not performing the job perfectly or even averagely, but Rosemond was performing the job up to the minimum requirements of the job. Rosemond's co-workers confirm Rosemond's position that she did improve and that she was basically performing the job in the months prior to her termination.

The Seventh Circuit has stated with regard to the reason of termination for unsatisfactory or unworkmanlike performance that

> The plaintiff need not show perfect performance or even average performance to satisfy [the element of satisfying the normal requirements of a job]. [The plaintiff] need only show that [her] performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge [her].

*Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1283 (7th Cir.1977). *Accord Graham*, 585 F.Supp. at 1044. "But *Flowers* holds that where, as here, an employee under work criticism makes a satisfactory rating and shortly thereafter is fired, an inference arises that factors other than prior unsatisfactory performance—factors forbidden by Title VII—were involved.... This case is within the *Flowers* principle[.]" *Graham*, 585 F.Supp. at 1044. The evidence in this case demonstrates to this court that other factors, specifically the factor of race discrimination, were involved in the decision to terminate Rosemond.

 In the appraisals done of plaintiff, plaintiff was not compared with other employees in the Data Processing Department by any objective or blind formula for performance. Plaintiff was not rated independently by supervisors other than her immediate supervisor, a person with whom Rosemond had personal difficulties in communication and who was not very forthcoming in her communications, guidance or aid to

Rosemond. Such rating systems have been identified "as seriously suspect factors in considering indirect evidence of forbidden bias in employment practices and decisions." *Graham*, 585 F.Supp. at 1040. The most disquieting aspect of the rating system used to terminate Rosemond is the private log of Rosemond errors compiled by Aldrich without Rosemond's knowledge or consent. This log was not made known to Rosemond and was not a part of Rosemond's official personnel file. It was a document created for use in Rosemond's specific instance. Aldrich has not kept such a log on any employee in her department either before or after Rosemond. The evidence shows that Rosemond was treated more severely in terms of the records kept regarding Rosemond's performance. *See Brown v. A.J. Gerrard Mfg. Co.*, 643 F.2d 273 (5th Cir.1981), *aff'd on reh.*, 695 F.2d 1290, 1293 (1983) (*en banc*). *See also Graham*, 585 F.Supp. at 1039. The more severe treatment of a plaintiff than other employees is competent evidence that the employer's stated reasons for penalty to or discharge of the employee are pretextual attempts to put an acceptable face on the practice of discrimination. *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. at 1825.

Other employees at Cooper were given opportunities to transfer when they encountered difficulties of job performance. Although Rosemond was told of the opportunity to transfer, Rosemond was never informed that she was in danger of being terminated and that she should consider transfer in lieu of termination. Rosemond would have considered transfer in lieu of termination and was more than adequately qualified for several other jobs available at Cooper. Cooper meted out different treatment to Rosemond than the treatment given all other employees in the department in which Rosemond worked and in other areas of Cooper employment. *Cf. Burdette v. FMC Corp.*, 566 F.Supp. 808, 817 (S.D.W. Va.1983) (discrimination inferred where different treatment meted out by employer). Another way of putting the treatment received by Rosemond is that Cooper was not dealing squarely with Rosemond and such fact outweighs "the expectable *post hoc* explanations as to why white employees were treated better." *Graham*, 585 F.Supp. at 1045 (citing *Lindsey v. Angelica Corp. et al.*, 508 F.Supp. 363, 366 (E.D.Mo. 1981)).

■ The bottom line in this case is that the reason articulated by Cooper for its decision to terminate Rosemond is not a legitimate nondiscriminatory reason because it is a reason simply not believable. Cooper intentionally discriminated against Rosemond. This court concludes that it believes Rosemond's explanation of Cooper's motivation; the evidence adduced supports her explanation. Rosemond was a wholly and highly credible witness, straightforward and forthright in her bearing, demeanor and answers. In contrast, Aldrich was defensive and not as apparently forthright or candid in her testimony.

Rosemond was given no opportunity to perform all of the job duties which comprised the position of computer operator. Rosemond was a skilled computer operator and was never allowed to work on the computer at Cooper. Cooper gave Rosemond no opportunity to demonstrate her skills as an on-line computer operator. Cooper gave Rosemond virtually no training and discouraged Rosemond's questions from the outset of Rosemond's employment. Rosemond was the only person ever employed by Aldrich who remained an off-line computer operator during her entire tenure of employment. Rosemond was never trained pursuant to the custom existent at Cooper.

Cooper subjected Rosemond to an inordinate and unusual amount of documentation of errors, the most damaging document of which was not made a part of plaintiff's file and was never disclosed to the plaintiff. Cooper placed Rosemond on probation, never informing Rosemond that the probation was leading to termination if her immediate supervisor did not subjectively determine that Rosemond had improved her performance to Aldrich's set level. Cooper did not

assist Rosemond in improving her performance because Rosemond's supervisor did not give assistance as part of her supervision technique. Cooper did not present Rosemond with the opportunity given other employees at Cooper to transfer to another position in lieu of termination. Rosemond was the only black office employee at Cooper and the only black employee Aldrich had ever had.

Cooper treated Rosemond differently and disparately because Rosemond was black. Such treatment is forbidden by Title VII of the Civil Rights Act of 1964. Cooper discriminated against Rosemond on the basis of her race in violation of Title VII of the Civil Rights Act of 1964. *Cf. Loiseau v. Dept. of Human Resources,* 567 F.Supp. 1211 (D.Ore.1983) (disparate treatment proven where employee given no opportunity to demonstrate skills, employee discouraged from asking questions, and employee given duties to perform with no training).

Plaintiff has proven a violation of Title VII and is entitled to recover damages. As the prevailing party in a Title VII claim, plaintiff is further entitled to recover attorney fees. Per the stipulation of the parties, plaintiff is entitled to recover back pay in the amount of $6,293.16 and fringe benefits in the amount of $2,256.86. Plaintiff is further entitled to recover costs and attorney fees in the amount of $6,575.18. Plaintiff requests front pay in lieu of reinstatement to her position as computer operator at Cooper.

■ The court concludes that front pay is not warranted in this case. "Front pay is the term used to describe damages paid as compensation for training or relocating to another position. An award of front pay is made in lieu of reinstatement when the antagonism between employer and employee is so great that reinstatement is not appropriate." *Fadhl v. City and County of San Francisco,* 741 F.2d 1163, 1167 (9th Cir.1984). There is a lack of evidence in the record that Rosemond is attempting to gain further training or to relocate to another position as a computer operator. The court concludes that it would be speculative to award front pay as front pay is an equitable award designed to make whole a plaintiff "for a reasonable future period required for the victim to reestablish her rightful place in the job market." *Goss v. Exxon Office Systems Co.,* 747 F.2d 885, 889 (3d Cir.1984). The court simply has before it no evidence from which it could determine an appropriate award of front pay for a reasonable future period. An award of front pay is discretionary with the trial court, *Dillon v. Coles,* 746 F.2d 998, 1006 (3d Cir.1984); the court chooses not to exercise its discretion in this case to award front pay. The court concludes that the plaintiff will be made whole by an award of back pay and fringe benefits.

■ Rosemond also raised a claim of a violation of § 1981. The parties agree and this court concurs that the legal elements of a § 1981 claim are satisfied if a plaintiff successfully proves the legal elements amounting to a violation of Title VII. "When, as in this case, the plaintiff predicates liability under Title VII on disparate treatment, the legal elements of the claim are identical to those of a claim under § 1981. A plaintiff asserting either claim must prove intentional discrimination." *Lincoln v. Board of Regents of University System,* 697 F.2d 928, 935 n. 6 (11th Cir. 1983) (citations omitted). Rosemond has prevailed on her Title VII claim. Rosemond has proven that Cooper intentionally discriminated against her on the basis of her race. She is entitled to recover damages under § 1981.

The Seventh Circuit recently stated:

Section 1981 ... is aimed at rectifying individual acts of discrimination against racial and ethnic minorities in a myriad of situations, and it clearly lacks a "make-whole" purpose [the purpose of Title VII]. Section 1981's emphasis on eradicating direct personal discrimination and on making victims of such discrimination more than "whole" is mirrored by the fact that, in order to recover, a plaintiff must always prove that the defendant intentionally discriminated against

him and by the remedies available to an injured plaintiff, i.e., punitive damages and compensatory damages for physical and mental humiliation and emotional harm.

*Musikiwamba v. ESSI, Inc.,* 760 F.2d 740, 748 (7th Cir.1985) (citation omitted). Plaintiff has proven a violation of § 1981 and can recover proven damages for physical and mental humiliation and emotional harm suffered by her.

There is not much evidence in the record of any significant mental humiliation or emotional harm suffered by the plaintiff during her nine month tenure of employment at Cooper. There is no evidence of physical humiliation or harm. Plaintiff did suffer some mental humiliation and some emotional harm from her experience at Cooper, largely in the form of her feelings of isolation and feelings of discrimination. However, plaintiff did testify that she did enjoy her job and enjoyed her co-workers and that no racial comments were ever made to her or around her such that she heard them. The court concludes that plaintiff did suffer mental humiliation and emotional harm, but not to a serious extent. The court concludes that plaintiff is entitled to an award of damages for her § 1981 claim in the amount of $500.00. Such an award adequately compensates plaintiff for the mental humiliation and emotional harm proven at trial.

 Plaintiff has also requested, as part of her Title VII request for relief, the expungement of her employment records at Cooper, including, but not limited to her performance appraisals and any and all written memoranda. Plaintiff is clearly entitled to such relief. This court will order the expungement of plaintiff's employment records with the defendant, including plaintiff's performance appraisals, any and all written memoranda in plaintiff's official personnel file and the private log of errors kept by Aldrich regarding Rosemond.

This memorandum of decision contains the court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. *See*

*Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1183–84 (7th Cir. 1982).

### Conclusion

Plaintiff has established by a preponderance of the evidence that a violation of Title VII has occurred, thus entitling the plaintiff to recover.

To remedy the violation, the court ORDERS the following. Rosemond is awarded back pay in the amount of $6,293.16 and fringe benefits in the amount of $2,256.86. Defendant Cooper is hereby ORDERED to expunge Rosemond's employment records including Rosemond's performance appraisals, any and all written memoranda in Rosemond's official personnel file and the private log of errors compiled by Aldrich. Plaintiff is awarded attorney fees in the amount of $6,575.18. Finally, a violation of § 1981 has been shown, thus entitling plaintiff to recover. The court awards plaintiff compensatory damages in the amount of $500.00.