**Adelaida DIMARANAN, Plaintiff,**

**and**

**U.S. Equal Employment Opportunity Commission, Intervenor,**

**v.**

**POMONA VALLEY HOSPITAL MEDICAL CENTER, aka Pomona Valley Community Hospital, a corporation; Robert Burwell, an individual; Jan Paulson, an individual; Dennis Phelps, an individual; and Mary Holstein, an individual, Defendants.**

No. CV 89–4299.

United States District Court,
C.D. California.

Oct. 21, 1991.

Robin S. Toma, Paul L. Hoffman, Mark D. Rosenbaum, Sobel/Hoffman, and Stewart Kwoh, Kathryn K. Imahara, Los Angeles, Cal., for plaintiff.

Carlo Coppo, Martha L. McGill, Jose Tabuena, Coppo & Cosgrove, San Diego, Cal., for defendants.

Ralph D.H. Fertig, Los Angeles, Cal., and Dolores Y. Luciano, Pasadena, Cal., E.E.O.C., for intervenor.

## MEMORANDUM OPINION AND ORDER

RAFEEDIE, District Judge.

### INTRODUCTION

In Mid–1988, in an effort to ameliorate the increasing divisiveness and tension in the nursing staff of the Mother/Baby Unit ("M/B Unit") of the Pomona Valley Community Hospital, certain members of management announced a rule prohibiting the use of Tagalog, the native language of the Phillipines, by Filipina nurses during the evening shift of the M/B Unit. Within a little over a year of the announcement of this language rule, the plaintiff, Adelaida Dimaranan, who was fluent in both English and Tagolog, was demoted from her position as Assistant Head Nurse of the M/B Unit and transferred to another unit despite her long record of consistently high performance evaluations.

What started as a management problem ended in this Title VII action. The plaintiff asserts that Pomona Valley Community Hospital adopted an "English Only" rule in violation of Title VII's prohibition against discrimination in the workplace based on national origin. The plaintiff also contends that she was retaliatorily demoted when she refused to comply with the language policy.

### FINDINGS OF FACT

Adelaida Dimaranan, a native of the Philippines, was first employed by defendant Pomona Valley Community Hospital in 1977 and was transferred to the Mother/Baby Unit (the "M/B Unit") of the Hospital in 1981. During the period that plaintiff worked on the M/B Unit she was supervised by Mary Holstein, the head nurse of the Unit. Ms. Holstein became plaintiff's patron and sponsor, actively encouraging plaintiff's advancement and eventually promoting her, in 1986, to Assistant Head Nurse ("AHN") of the M/B Unit for the evening shift. Ms. Holstein is among the persons now charged with intentionally discriminating against plaintiff on account of her national origin.

Prior to plaintiff's 1986 promotion, her personnel record demonstrates a long and satisfactory employment history with the Hospital. The plaintiff had received consistently high performance reviews and was described by Ms. Holstein as a very capable nurse with excellent clinical skills and an excellent addition to the M/B Unit. At Ms. Holstein's prompting, Ms. Dimaranan applied for, and eventually received, R.N. II status, a status awarded only to those nurses who displayed superior clinical skills.

For the year following plaintiff's 1986 promotion, she continued to receive uniformly above-standard performance evaluations from Ms. Holstein. The only negative feature of plaintiff's reviews was concerns about her "listening skills," as it was noted that plaintiff needed to develop more effective channels of communication with her staff.

However, in late 1987, problems began to surface on the evening shift of the M/B Unit. Staff nurses began complaining about plaintiff's management performance, including her failure to listen to staff nurses, to properly implement the mother/baby couplet care program, and to communicate effectively with staff members. There was criticism of plaintiff's authoritarian management style, of unfair and unbal-

anced patient assignments, and of favoritism in the treatment of staff nurses.

There were also complaints concerning plaintiff's use of Tagalog, the native language of the Filipina nurses, on the Unit. A nurse that had only recently been transferred to the evening shift of the Unit complained to Ms. Holstein that the use of Tagalog was rude and disruptive, and that the non-Filipina nurses felt left out when Tagalog was spoken. Ms. Holstein was deeply concerned about the disunity among the nurses on the evening shift of the M/B Unit, given the critical nature of the services provided in the Unit. She relayed these concerns to Jan Paulson, Vice-President of Nursing Services, and together they met with plaintiff to counsel her regarding the complaints. The complaints, however, continued.

In February, an evening shift nurse on the Unit told Ms. Holstein that plaintiff was showing a preference for her "friends" and that the Filipina nurses' use of Tagalog interfered with the other nurses' ability to communicate with plaintiff. This nurse believed that the Unit was disorganized and essentially divided into two groups. The dividing factor appeared to be the use of Tagalog.

Ms. Holstein was disturbed by these comments and spent an evening working on the Unit. She discovered general discontent among many of the Unit's nurses, finding that many nurses believed that the Unit was fragmented and that plaintiff ignored their suggestions and concerns. Ms. Holstein also discovered that Tagalog was spoken frequently among the Filipina nurses on the Unit, making the non-Tagalog speaking nurses, and to some extent, even patients, feel uncomfortable and excluded. Ms. Holstein then met with Connie Tanquary, Director of the M/B Unit. Both Ms. Holstein and Ms. Tanquary believed that the use of Tagalog was contributing to the dissension among the Unit's nurses, and that plaintiff, rather than working to harmonize the ethnically diverse nurses, was instead fostering the Unit's disunity by continuing to use Tagalog herself and by encouraging the other Filipina nurses to use it also.

In an attempt to remedy this increasing dissension, a staff meeting was held in April, 1988. It was at this meeting that Ms. Tanquary first asked that Tagalog not be spoken on the Unit. When the evening staff met again the following month, however, several nurses complained that Tagalog was still being spoken during the evening shift. Ms. Holstein responded by prohibiting the use of Tagalog on the Unit.

Despite the announced language restriction, the Filipina nurses, including plaintiff, continued to use Tagalog, and hostilities continued to further divide the Unit. In June 1988, Ms. Tanquary met with Personnel Director Dennis Phelps to discuss plaintiff's relocation. It was determined, however, that there was insufficient documentation at that time to justify plaintiff's relocation, and consequently, no action was taken. In August 1988, Ms. Holstein, Ms. Tanquary, and Ms. Paulson met to consider a demotion and transfer of plaintiff, in light of Mr. Phelps' view that the existing documentation was insufficient to justify plaintiff's demotion.

In January 1989, plaintiff received her yearly performance evaluation covering the period of August 1987 to August 1988. Unlike plaintiff's prior evaluations, the tone and content of this evaluation were almost entirely negative. Almost every aspect of plaintiff's management skills was criticized. She was characterized as defensive, unable to listen or to be fair, and inefficient at solving problems. Management, therefore, concluded that plaintiff lacked the judgment necessary to lead her staff, and that, unless she demonstrated improvement, she would be terminated.

On March 3, 1989, plaintiff filed a charge with the California Department of Fair Employment and Housing and the Equal Employment Opportunity Commission ("EEOC"). The plaintiff claimed discrimination based on national origin and alleged that Pomona Valley Community Hospital's "No Tagalog" rule violated the Filipina nurses' civil right to be free from employment discrimination. The plaintiff also

claimed that her poor performance review was in retaliation against her continued use of Tagalog on the Unit and her resistance to management's attempts to preclude the use of her native language.

A special staff meeting of the evening shift of the M/B Unit was held on March 22, 1989. At the meeting, Jan Paulson denied that the Hospital had an "English–Only" language policy. Robert Burwell, President of the Hospital, subsequently issued a letter to all Hospital employees, also denying a per se language restriction. Burwell's letter stated that an employee may speak a language other than English while on duty, provided that doing so did not interfere with the employee's ability to perform his or her duties and did not in any way interfere with patient care.

On March 28, plaintiff began a medical leave of absence. When she returned to work on June 17, her performance became the subject of almost daily scrutiny and documentation. The plaintiff filed this lawsuit on July 18, 1989.[1] On July 20, she was counseled and provided with an extensive written record of her deficiencies in the management and operation of her shift. An employee conference followed, during which plaintiff's performance was again evaluated very critically.

On September 21, plaintiff was removed as Assistant Head Nurse of the M/B Unit and reassigned as a staff nurse in the Secure Care Unit of the Emergency Room. She subsequently applied for, and was denied, other available positions in the Hospital.

From these facts, plaintiff asks this Court to conclude that (1) Pomona Valley Community Hospital had an "English–Only" rule; (2) that such a rule violated Title VII; and (3) that Pomona Valley Community Hospital unlawfully retaliated against plaintiff, in violation of Title VII, for refusing to comply with its language prohibition and for filing an EEOC charge. The plaintiff seeks declaratory and injunc-

tive relief, as well as compensatory damages.

## DISCUSSION

### A. DID THE HOSPITAL HAVE AN ENGLISH–ONLY RULE?

■ Contrary to plaintiff's assertions, the Court finds that Pomona Valley Community Hospital did not have an "English-only" rule. It is beyond question that certain members of the Hospital's management team sought to restrict the use of Tagalog by the Filipina nurses employed in the M/B Unit on the evening shift. But this attempt is far from an English-only rule. The restriction was limited to the evening shift of the M/B Unit, and restricted the use of Tagalog only. The plaintiff herself admitted, in her EEOC Charge and in her testimony to the Court, that there was no restriction on the use of other non-English languages in the Unit, such as Spanish.

It is the conclusion of the Court that the Hospital's language-related directives were little more than management's response to the increasing tension that was dividing the staff nurses on the M/B Unit. The non-Filipina nurses believed that plaintiff showed favoritism in terms of unfair patient assignments and workloads towards other Filipina nurses. The non-Filipina nurses resented the only objective criterion which could be attributed to this favoritism—the use of Tagalog.

Management responded to these concerns, in part, by attempting to prohibit the use of Tagalog on the Unit during the evening shift. In this context, the Court cannot conclude that the Hospital has or had a per se language rule which prohibited the use of all languages except English. The "No Tagalog" rule was, at most, a shift-specific directive tailored to respond to certain conflicts among identified staff nurses. Even this prohibition, in its limited form, was repealed by Jan Paulson during

---

**1.** In May, 1990, the EEOC was granted leave to intervene in this matter and the EEOC actively participated in the trial. In considering the issues presented herein, the Court makes no distinction between the evidence and arguments offered by the plaintiff and those offered by the EEOC as intervenor.

the March 1989 staff meeting and again by Robert Burwell in his letter dated March 24, 1989.[2]

While the Court cannot conclude that the Hospital adopted an "English-only" rule, it must nonetheless consider in what way, if any, the Hospital's language directive may have been a violation of Title VII.

## B. TITLE VII DISCRIMINATION

Title VII, which prohibits discrimination in employment based on race, color, sex, religion or national origin, was enacted to assure equality of employment opportunities and conditions, to eradicate discrimination in employment, and to attempt to make victims of employment discrimination whole. 42 U.S.C. § 2000e–2(a)(1) (1982).[3] The plaintiff has framed her complaint utilizing both of the common theories of Title VII liability: disparate treatment and disparate impact.

### (1) *Title VII Disparate Treatment:*

The plaintiff first contends that the hospital's language policy violated Title VII in that it effected the disparate treatment of a protected group based on the group's national origin. To prevail under this theory, plaintiff must prove that Pomona Valley Community Hospital intended to discriminate against a protected group. This may be done in two ways: (1) by offering direct evidence of discriminatory intent (*Transworld Airlines v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)); or (2) by showing proof of discriminatory animus based on circumstantial evidence (*McDonnell Douglas Corp. v.*

*Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

Where there is direct evidence that a rule or practice was adopted for the purpose of unlawful discrimination, the rule violates the statute unless it can meet the strict bona fide occupational qualification test. *See Dothard v. Rawlinson,* 433 U.S. 321, 333, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977). The more common manner of proving discriminatory intent, however, is through the use of circumstantial evidence. *McDonnell Douglas,* 411 U.S. at 802–05, 93 S.Ct. at 1824–25. Under this type of analysis, a plaintiff must first establish a prima facie case of discrimination by offering evidence that gives rise to an inference of unlawful discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate legitimate nondiscriminatory reasons for its actions. The plaintiff must then demonstrate that the employer's alleged reasons for the adverse employment decision are a mere pretext for a discriminatory motive. *Yartzoff v. Thomas,* 809 F.2d 1371, 1373–74 (9th Cir. 1987). The ultimate burden of persuading the trier of fact that the defendant engaged in intentional discrimination remains at all times with the plaintiff. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

It is clear that the restriction on the use of Tagalog was not the result of racial animus. Tagalog was spoken for many years without complaint from management. Moreover, Mary Holstein, one of

---

**2.** By this letter the Hospital has openly declared that it does not have an English–Only rule and effectively repealed any per se language prohibition it may at one time have had. Moreover, the Court has found that the Hospital did not have an English-only rule. The relief sought with respect to the defendants' "English-only rule" has therefore been mooted. *See Gutierrez v. Municipal Court of S.E. Judicial Dist.,* 838 F.2d 1031 (9th Cir.1988), *vacated as moot,* 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989).

The Court must nonetheless consider the plaintiff's claim that she was intentionally dis-

criminated on the basis of her national origin and that she was unlawfully retaliated against for engaging in protected activities.

**3.** This section states as follows:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

the parties charged with having implemented and enforced the language rule with an intent to discriminate, had previously acted as plaintiff's benefactor, encouraging and facilitating her promotion. Ms. Holstein's prior relationship with plaintiff militates heavily against a conclusion that the language rule was instituted with an intent to discriminate against plaintiff and the other Filipina nurses because of their national origin. However misguided and ineffective the Hospital's language restriction may have been, there is simply no basis for concluding that it was motivated by ethnic animosity.

It is clear that management was not primarily concerned with the use of Tagalog, but rather with the breakdown of cohesion on the M/B unit and the effect of dissension upon the well-being and safety of mothers and their newborns. The Court is absolutely certain that had complaints by staff nurses regarding inappropriate couplet care, divisiveness, favoritism, and poor communication on the Unit not surfaced, the Hospital would never have been concerned with the use of Tagalog. This action should never have been a Title VII case. Management's decision to focus on the use of Tagalog, in an effort to restore crucially important harmony and cohesion, permitted plaintiff to escalate what was merely a management problem into a Title VII case. Language was clearly never the central focus of management, and Tagalog was, so to speak, merely caught in the cross-fire. The Court, therefore, cannot conclude that the Hospital's language rules violated Title VII by intentionally discriminating against plaintiff on the basis of her national origin.[4]

The Court's holding is consistent with *Jurado v. Eleven–Fifty Corp.*, 813 F.2d 1406 (9th Cir.1987), a case involving a radio announcer of Mexican–American descent who was fired because he refused to comply with his employer's demand that he stop speaking Spanish during his radio broadcast. The Ninth Circuit Court of Appeals determined that there was no evidence that the language order was racially motivated. The court further determined that the language restriction itself was not evidence of discrimination, because Jurado, who was fluently bilingual, could easily have complied with the rule. The same can be said of the plaintiff in the present case. The plaintiff, who was fluently bilingual in English and Tagalog, could have easily complied with the Hospital's prohibition against the use of Tagalog while on the shift. She resisted compliance with the restriction, not because she was unable to comply, but because she believed that it was her civil right to speak her native tongue. Pursuant to *Jurado*, however, this does not establish intentional discrimination against plaintiff on the basis of national origin.

### (2) *Title VII Disparate Impact:*

■ The plaintiff also makes a Title VII disparate impact claim. Disparate impact analysis exemplifies the broad protective purposes of Title VII, which is designed to remove all artificial barriers that act as hurdles against the advancement of protected groups. *Connecticut v. Teal*, 457 U.S. 440, 447–448, 102 S.Ct. 2525, 2530–31, 73 L.Ed.2d 130 (1982). To make a prima facie disparate impact case, the plaintiff must identify a facially-neutral employment practice that disproportionately disadvantages one group as against another. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Unlike a disparate treatment claim, under a disparate impact claim the plaintiff need not show that the employer intended to discriminate. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1845 n. 15, 52 L.Ed.2d 396 (1977). Rather, the plaintiff need only identify a facially-neutral practice which has a significant impact on a protected group. The burden then shifts to the de-

---

**4.** Alternatively, the Hospital argues that Title VII's prohibitions against national origin discrimination do not extend to language rules implemented in a bilingual workforce. Because the Court finds that plaintiff has not shown that the Hospital acted with a discriminatory motive, it need not address the broader question of whether its language prohibition is simply immune from Title VII scrutiny.

fendant employer to produce evidence of a business justification for his employment practice. The ultimate burden of persuasion, however, remains at all times with the plaintiff, for it is the plaintiff that must ultimately prove that, because of her national origin, she was denied an equal employment opportunity. *See Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989).

[redacted] The Court finds that plaintiff's disparate impact argument must fail, because she has not identified a facially-neutral employment practice. Rather, the employment practice of which plaintiff complains was expressly non-neutral, in both word and fact. As announced at the various staff meetings, only Tagalog was prohibited. The policy was not what could be deemed a facially-neutral "English–Only" policy. Both sides agree that Spanish was spoken on the Unit without complaint.

The plaintiff suggests that the "No Tagalog" rule is facially neutral in that it applies to everyone, but only has an impact upon those whose native tongue is Tagalog. Plaintiff's reasoning, however, is not sound, for under this view, every employment rule, even those obviously discriminatory, would be considered facially neutral. For an example, under this view, a prohibition against the promotion of minorities could be said to apply neutrally to everyone but to limit the advancement of only minorities. This is not the type of situation which the disparate impact theory is intended to guard against. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (disparate impact claim based on adverse impact of objective education criteria and employment-related tests); *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (disparate impact claim premised on adverse impact of height and weight requirements for hiring prison guards).

Because plaintiff has failed to identify a facially-neutral employment practice, any further inquiry into her disparate impact claim is not required. Thus, the Court is not required to reach the question of whether the defendant established a valid business necessity for the allegedly facially-neutral language restriction. *See, Ward Cove Packing v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).

## C. TITLE VII RETALIATION

[redacted] An employer may also violate Title VII by retaliating against an employee who has opposed any practice which is or is reasonably thought to be unlawful under Title VII. 42 U.S.C. § 2000e–3(a).[5] The order and allocation of proof governing retaliatory demotions is similar to that in a Title VII disparate treatment analysis. *See Ruggles v. California Polytechnic State Univ.,* 797 F.2d 782 (9th Cir.1986). The employee must make a prima facie case by showing: (1) that she engaged in an activity protected under Title VII: (2) that her employer subjected her to an adverse employment action; and (3) that there is a causal link between the employer's action and the protected activity. *Jordan v. Clark,* 847 F.2d 1368 (9th Cir.1988); *Miller v. Fairchild Indus.,* 797 F.2d 727, 730 (9th Cir.1986).

To establish the causal link, which must be shown by a preponderance of the evidence, the plaintiff must establish that "but-for" [6] the protected activity, the plaintiff would not have suffered the adverse employment action. This connection can usually be shown only by inference, as drawn from circumstantial evidence. *Jordan,* 847 F.2d at 1376.

5. 42 U.S.C. § 2000e–3(a) (1982) provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

6. As explained in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), but-for causation is a hypothetical construct. In determining whether a particular fact was a but-for cause of a given event, the trier of fact must begin by assuming that the factor was present at the time of the event, and then ask whether, even if that factor had been absent, the event nevertheless would have transpired in the same way.

■ Once a prima facie case of retaliation is established, the burden shifts to the defendant to offer legitimate, non-discriminatory reasons for the adverse action. The plaintiff must then be given the opportunity to show that the defendant's justification is merely a pretext for retaliation. *Ruggles*, 797 F.2d at 786; *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).

■ The plaintiff in this case also asserts a "mixed-motive" theory of retaliation liability. Under this theory, an employer may violate Title VII when the plaintiff shows that an employment decision resulted from a mixture of legitimate motives and illegitimate discrimination. *See, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228, 237, 109 S.Ct. 1775, 1785, 104 L.Ed.2d 268 (1989). To escape liability, the employer must prove that it would have made the same decision even if it had not allowed the illegitimate motive to play a role in its consideration.

As in disparate treatment cases, the burden of persuasion in a retaliation claim stays at all times with the plaintiff. The employer, however, has the burden of justifying its ultimate decision, a burden that has been deemed more appropriately to be an affirmative defense. *Price Waterhouse*, 490 U.S. at 239, 109 S.Ct. at 1788.

■ While the Court has found that the Hospital's language directive did not violate Title VII, opposition to the directive is nonetheless a protected activity under Title VII. It is not necessary to find that the practice was unlawful under Title VII to conclude that an employer engaged in unlawful retaliation in violation of Title VII. *Jurado*, 813 F.2d at 1411; *Sias v. City Demonstration Agency*, 588 F.2d 692 (9th Cir.1978). Rather, an employee's opposition to an employment practice which the employee reasonably believes to be unlawful under Title VII is protected by the statute.[7] *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir.1983).

■ The Court believes that plaintiff's opposition to the language policy was an essential ingredient in the demotion decision, and that plaintiff, therefore, suffered unlawful retaliation. Beginning in late 1987, when the language issue surfaced, and extending throughout plaintiff's tenure as Assistant Head Nurse of the evening shift, plaintiff consistently refused to comply with the Hospital's order not to speak her native tongue and, likewise, refused to enforce the policy with respect to the other Filipina nurses. The plaintiff's opposition to the Hospital's directive culminated in the filing of the EEOC charge and, eventually, this lawsuit.

Although plaintiff had a long and commendable employment history with the Hospital, starting in January 1989, she began to receive uniformly negative performance evaluations, her work became subject to intensive scrutiny, and she was eventually demoted and moved to another unit within the Hospital. This abrupt change in plaintiff's performance evaluations occurred almost simultaneously with the rise of problems concerning the use of Tagalog and plaintiff's refusal to refrain from using the language. Before the language-related concerns arose, the only area in which plaintiff had been routinely criticized was her "listening skills," but as reported in plaintiff's performance evaluation in late 1987, even this deficiency was improving.

It appears that plaintiff's continued use of Tagalog was the catalyst of the divisiveness in plaintiff's staff, and lead to the magnification of relatively minor criticisms against the plaintiff. When the language issue surfaced, rather than trying to diffuse the problem, plaintiff exacerbated it by becoming defensive and aligning herself with other Tagalog-speaking nurses, rather than working with management to bring harmony to the Unit. Thus, plaintiff's failure in this regard may properly be considered a breach of her duty as Assistant Head Nurse. This was clearly a factor in management's decision to seek the plaintiff's demotion. Thus, it is clear that plain-

---

**7.** The Court finds that the holding in *Gutierrez,* although vacated, would make it reasonable for the plaintiff to believe that she had protected language rights under Title VII.

tiff's continued use of Tagalog and her refusal to assist in implementing the Hospital's directive lead, in part, to plaintiff's demotion.

The most telling evidence of a retaliatory motive is the process by which a record was developed for the purpose of demoting plaintiff. As early as August 1988, it was clear that the management team wanted to remove plaintiff from her position as Assistant Head Nurse. However, it had already been determined that the existing documentation against plaintiff was insufficient to justify her demotion. The plaintiff filed her EEOC charge in March 1989, and by June 1989, when she returned to work from a medical leave, her performance was subjected to intensive, daily scrutiny. Not only did Ms. Holstein herself collect daily documentation, but she enlisted the aid of the night Assistant Head Nurse, who would arrive early to document plaintiff's shift's deficiencies. Other Assistant Head Nurses were not similarly scrutinized.

This exacting scrutiny of plaintiff's performance eventually resulted in her demotion in September, 1989, only two months after she filed this lawsuit. It taxes credulity that an employee with an almost unblemished employment history would suddenly, within one year's time, become an inefficient, abusive, and authoritarian manager. The incidents which were recorded during this heightened scrutiny were trivial and relatively common, the types of incidents that occur every day and on every shift as part of the normal operation of a maternity ward. Yet in plaintiff's case, these incidents resulted in written criticisms.

This intensive scrutiny and documentation after the initial determination that the record against plaintiff was insufficient to justify a demotion permits the inference that plaintiff's supervisors set out to build a record for the purpose of demoting plaintiff. It is clear that everyday occurrences were magnified to the level of reportable derelictions in order to supply a record to form the basis of plaintiff's demotion. Additionally, the proximity in time between the filing of the EEOC charge and this lawsuit and plaintiff's demotion also permits the inference of retaliation.

The plaintiff's demotion and transfer, therefore, resulted from a mixture of legitimate motives and impermissible retaliation. The Hospital has not shown that it would have made the same decision even if it had not allowed the illegitimate motive to play a role in its consideration. The Court is not convinced that plaintiff would have been demoted had she not opposed the defendant's language directives and filed the EEOC charge and this lawsuit. Because plaintiff's resistance to the Hospital's language directive was an essential ingredient in the demotion decision, it is the conclusion of the Court that plaintiff suffered unlawful retaliation and should be afforded an appropriate remedy.

## D. REMEDIES FOR RETALIATION

In fashioning a remedy, the plaintiff is entitled to be made whole. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). As the first order of relief, the defendant, its agents, and its representatives are enjoined from further retaliation against the plaintiff. As the second order of relief, the plaintiff has requested expungement of the unfavorable employee assessments and performance evaluations that served as the basis for her demotion. *See Rosemond v. Cooper Industrial Products*, 612 F.Supp. 1105 (D.Ind.1985). Because Title VII entitles individuals who suffer violations to be made whole for *all* injuries suffered on account of the unlawful conduct, this request is appropriate. The Court orders expungement of all plaintiff's employment records, dated after December 1987, that reflect poor performance evaluations during her tenure as AHN on the night-shift. This would include formal performance appraisals, written memoranda maintained in the plaintiff's personnel file, and any official or unofficial log of criticisms or errors kept by the Hospital or its employees.

The plaintiff also seeks back pay, a remedy expressly contemplated by Title VII, and clearly proper in this case. The

**348**

amount of back pay that should be awarded, however, is at this time uncertain. There has been testimony that Pomona Valley has eliminated the AHN position which plaintiff previously filled. Even if plaintiff had not been demoted, she would no longer be serving in the same capacity at the Hospital. The plaintiff is nonetheless entitled to a remedy that will put in her on equal footing, economically, with those who had similar positions within the Hospital's hierarchy. Thus, plaintiff is entitled to the differential between what she received in terms of pay and benefits after her demotion, and what the other nurses holding the same rank as plaintiff who were not demoted received from the time of plaintiff's demotion up until the time that the position was abolished and through the date of entry of judgment. Neither party has presented this Court with direct evidence regarding the amount of back-pay that would be appropriate. The parties are therefore ordered to reach an agreement on this if they can so. The Court reserves jurisdiction over this issue.

The plaintiff also seeks reinstatement. Here, reinstatement to the position of Assistant Head Nurse of the M/B Unit is impossible, as that position has been abolished. The plaintiff, however, seeks reinstatement to a position in Pediatrics. Plaintiff should be offered a position in Pediatrics in a nursing position for which she is qualified, and is ordered restored to the same position in terms of salary, benefits, and assignments as other assistant head nurses whose positions in the M/B Unit were abolished. The parties are ordered to reach an agreement on the issues of salary and benefits presently received by these nurses, and plaintiff shall be entitled to the same.

The Court reserves jurisdiction to resolve any disputes which might arise with respect to these issues.

The parties are additionally ordered to file motions for attorneys' fees which address the issue of entitlement to such fees in accordance with this Court's standing Order regarding attorney fees. These mo-

tions shall be filed within the period prescribed by Local Rule 16.10.

It is further ordered that the parties shall within ten days submit a joint proposed judgment containing all appropriate relief herein ordered.

IT IS SO ORDERED.